No. 89,547

STATE OF KANSAS, *Appellee,* v. MICHAEL K. MATTOX, *Appellant.*

(124 P.3d 6)

Opinion filed December 9, 2005.

*Randall L. Hodgkinson,* deputy appellate defender, argued the cause and was on the briefs for appellant.

*Robert D. Hecht,* district attorney, argued the cause, and *Deborah L. Hughes,* assistant district attorney, and *Phill Kline,* attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: Michael Mattox was convicted by a jury of one count of aiding and abetting unintentional second-degree murder and one count of aiding and abetting criminal discharge of a firearm. The Court of Appeals reversed in part, holding that Mattox's statements made to three Topeka Police Department detectives and evidence obtained as a result of those statements should have been suppressed. It affirmed the district court on all other issues, however, including the admission into evidence of Mattox's statements made to Douglas County Sheriff's Office booking officer Mark Unruh. *State v. Mattox*, No. 89,547, unpublished opinion filed April 2, 2004.

Both Mattox and the State filed petitions for review, which we granted solely on the suppression issues. Our jurisdiction is pursuant to K.S.A. 60-2101(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in admitting Mattox's statements to Douglas County Sheriff's Office booking officer Mark Unruh? No.
2. Did the district court err in admitting Mattox's statements to Topeka Police Department detectives and Mattox's handgun obtained as a result of those statements? No.
3. Did an independent basis for admitting Mattox's handgun exist under *United States v. Patane*, 542 U.S. 630, 159 L. Ed. 2d 667, 124 S. Ct. 2620 (2004)? Moot.

Accordingly, we affirm in part and reverse in part the Court of Appeals and affirm the district court.

**FACTS**

Officer Matthew Ford of the Topeka Police Department was on duty October 11, 2001, when he responded to the 1100 block of Carnahan regarding reported gunshots. When he arrived at 3:21 a.m., he found a gray car stopped on the median; the car was still running and music was playing. John Lane was slumped over in

the driver's seat with two gunshot wounds to his head. Lane was taken by ambulance to a hospital but died shortly thereafter.

Although several people heard four or five rapid gunshots, the police found no eyewitnesses to the shooting. Four .380 caliber shell casings were found at the scene. Their locations were consistent with shots fired from a moving vehicle.

Five days after the Lane shooting, on October 16, 2001, Officers Joshua Guile and Matt Sarna of the Lawrence Police Department were dispatched to a Lawrence McDonald's restaurant regarding a possible robbery at a nearby Kwik Shop. Sarna searched the coat of the suspect, Michael Mattox, and found an empty magazine for a .380 caliber pistol in Mattox's right front pocket, as well as quite a bit of cash. Mattox was arrested for criminal trespass and transported by Guile to the Lawrence Investigation Center for an interview. On the way to the Center, Mattox made statements that he was afraid for his life; he thought people were coming after him and thought the officers were going to hurt him.

At 4:30 p.m. at the Center's interview room, Guile read Mattox his *Miranda* rights and after asking Mattox if he understood his rights after reading them all, Mattox answered, "Yes." Guile asked if Mattox was waiving his rights and if he would speak to the Lawrence police officers. Mattox said he wanted to speak with his lawyer, so Guile did not ask any further questions. Mattox was then taken to the county jail.

At 5:53 p.m. Mark Unruh, a corrections officer with the Douglas County Sheriff's Office, began booking Mattox for criminal trespass at the county jail. About 2 minutes into the booking, Mattox interrupted to say he had some information to tell Unruh. Unruh told him there was nothing Unruh could do with the information and he needed to be booked in. Several minutes later Mattox again interrupted to say, "I have some information I need to tell you." Unruh reexplained he merely booked people and there was nothing he could do with the information. Mattox repeated five or six times during the booking process that he had information he wanted to tell, and Unruh continued to tell Mattox he was not the person to receive such information. At one point Mattox became angry because Unruh would not listen to him.

At 7:30 p.m., after Mattox had been processed and showered, he approached Unruh and asked, "Are you ready to listen to me yet?" After moving to a juvenile processing room at Mattox's request for privacy, Unruh asked, "OK, what have you got to tell me?"

Mattox began by saying, "I have some information on a couple of murders." Unruh replied, "Okay, what about them?" Mattox first told Unruh about a murder at a bank. Unruh explained that all he could do with the information, as a corrections officer, was pass the information on to detectives. Unruh also began writing it down, telling Mattox he would pass the information on to detectives. Mattox did not object. Mattox then talked about his brother's murder for 5 to 10 minutes.

As Mattox talked, Unruh did not interrupt or question, except to make sure he had the names correct.

Unruh then went over his notes with Mattox to make sure everything was correct. After Unruh checked with Detective Massey for guidance, he began to type the information in a report to be placed in Massey's box. When informed of Massey's response, Mattox had no objection to this procedure. Unruh also gave Mattox a pencil and paper and suggested he write what he had told Unruh in his own words, a recitation that would be submitted with Unruh's report. While Unruh typed, Mattox wrote.

At 9:21 p.m., after Unruh finished his report on the two murders, he showed it to Mattox for accuracy. When Unruh asked if he had forgotten anything in his report, Mattox replied, "Well, I have some more information on another murder." Unruh then said, "Okay, tell me about it." Mattox then began to provide information on the Lane murder.

Mattox stated that around 3 a.m. on October 13, 2001, he was riding in a car driven by Robert Gigger behind the Pine Ridge Apartments in Topeka. When another car pulled up next to them on the driver's side, Gigger was agitated because the car had been swerving behind them. Gigger told Mattox to get the gun, which Mattox retrieved from the glove compartment. Gigger then took the .380 handgun registered to Mattox and shot the victim, John Lane. Mattox repeatedly said that he was not the shooter. He told

Unruh that after the shooting he and Gigger went to Mikey Watson's house and then home where they saw the murder on the news.

As Mattox talked, Unruh interrupted only to get times and locations correct. When Mattox was done talking about the Lane murder, Unruh advised Deputy Robertson who told him Topeka police would be called when Unruh was done. Unruh then typed the Lane murder information into his report and, when completed, read it to Mattox. Mattox's only comment was that he had not shot Lane. While Unruh had typed, Mattox had continued working on his statement, even asking for an eraser and another pencil at one point.

As Unruh was finishing his report, his shift ended, so he took Mattox to a holding cell, where Mattox continued to write. Unruh then went off duty and left the building around midnight.

Topeka Police Department Detectives Brian Hill, Gary Robinson, and Richard Volle were called into their police station at 10:30 that same night. They were previously aware that Lane had been shot while driving a car on Deer Creek Parkway and that .380 shell casings had been found in the area. They were now told that Mattox had been arrested in Lawrence for criminal trespass and was giving information on the Lane homicide. The detectives were told that according to Mattox, Robert Gigger had committed the crime.

The three detectives went to the Douglas County jail, arriving at 12:55 a.m. on October 17. They set up a video camera in the interview room, and Mattox was brought in. The detectives were aware that Mattox had written out a statement and saw he was holding a paper when he came in. They introduced themselves and told Mattox they were investigating the John Lane murder. None of the officers read Mattox his *Miranda* rights.

Several minutes into the interview, the following exchange took place:

"Detective:  You already told these guys [Douglas County] kind of what happened, that you guys were just driving down the street. Were you driving the car?
"Mattox:    No, I wasn't driving the car.
"Detective:  How many people was in the car?

"Mattox:     You guys are trying to trick me. It was only two but —
"Detective:  You and Robert?
"Mattox:     *I know I need to talk to a lawyer, because I know anything I say y'all are going to twist it.* But I don't know, I don't know if the gangs are setting me up. I don't know, I need to collect my thoughts. You all won't let me make a phone call. There's people out there that I gotta
             . . .
"Detective:  Here's the thing. You know you have all your rights in place, okay?
"Mattox:     *Huh?*
"Detective:  *You have all your rights.*
"Mattox:     *What's all my right?*
"Detective:  (Over each other) *Just like the TV show.*
"Mattox:     (Over each other) So I'm not under arrest for it? Right." (Emphasis added.)

   The videotaped interview lasted from approximately 1 a.m. until 2:30 a.m. Over its course, Mattox told the detectives that he and Gigger were riding in the car, going to a friend's house to smoke some marijuana. A car pulled up behind them, driving erratically and tailgating. They thought it might be other gang members wishing to do them harm. Gigger said, "There's a car coming up real fast." Mattox took the gun in his hand, and the car passed. Mattox saw it was not a gang member, but Gigger had taken the gun out of Mattox's hand. Mattox asked, "Should we shoot him for driving like that?" Gigger then repeatedly shot through the window and hit John Lane. Mattox never intended that Gigger would shoot the other driver.

   During the interview, Mattox stated that he had given Gigger the gun the evening of October 15. After much prodding, Mattox admitted that the gun was in a dumpster behind a strip mall in Lawrence.

   Near the end of the interview, at the request of Detective Robinson, Mattox signed the handwritten statement which he had brought with him. His statement, which tracks much of his videotaped interview, is as follows:

   "Me (Michael) and Robert Gigger was going to chill at Mikey Watkins house and smoke weed when we was driving down 21st street we made a left on a street I can't remember, it is right behind Pine Ridge where John Lane was kill on. John Lane was behind us but he was driving real crazy but I did'nt realize until now that Robert was going about 30 miles an hour the speed limit and John Lane

wanted to go faster so I think he wanted to pass us. But at the time it was happening I thought that he might be trying to shoot at us because Robert is a gang member and has got shoot at on some occasions so he made me think that someone was about to shoot at us in the car. Robert told me to get gun so I got the gun out of the glove box and pulled down the back seat [unreadable] and reached an got the clip out of the trunk. Eventually John Lane pass us and I was about to place everything back where I got it from while I was doing I made a comment that he deserves to be shoot at for driving behind like he was going to shoot us, but I didn't mean it. So when I said that Robert got hype up and took the gun and cock then shot at him about 5 or 6 times and kill him. When I saw that I couldn't explain how I felt. Then we went to Mikey house (not sure of address around SE 8th.) I was trying to make it seem like everything was cool and that he could trust me not to tell.

"[Signed] Michael Mattox 10/17/01"

In trying to locate the gun after the interview, the officers searched three or four dumpsters at several strip malls but were unsuccessful. With Mattox's physical assistance, at 4:50 a.m. they found in a dumpster a Smith and Wesson .380 automatic handgun that had been purchased by Mattox. Later that day, the officers executed a search warrant on Gigger's house where he was arrested and charged with the murder of John Lane. The gun was later determined to be a match for one of the bullets recovered from Lane's body and for the four shell casings found at the scene. Sometime after Gigger claimed that both he and Mattox had shot at Lane, Mattox was arrested for his involvement in the episode.

Mattox eventually filed a motion to suppress, and the district court conducted a hearing on January 30, 2002. Booking officer Unruh, Lawrence police officers Sarna and Guile, and Topeka detectives Hill, Volle, and Robinson were the only witnesses. On February 14, 2002, the court denied Mattox's motion concerning his statements to Unruh, both oral and written (with signature redacted), holding that Mattox had waived his right to counsel with Unruh. Based upon a determination that Mattox had clearly reinvoked his right to counsel during his videotaped interview with the Topeka detectives, however, the court granted the part of the motion concerning that interview, Mattox's signature on the handwritten statement, and the subsequently-found handgun.

On March 22, 2002, the court granted the State's motion for reconsideration, holding that Mattox had not clearly reinvoked his

right to counsel during the interview with the Topeka detectives. Accordingly, Mattox's videotaped interview, his signature on his handwritten statement, and the handgun were now admissible.

The State introduced information from the statements into evidence at the jury trial, as well as the videotaped interview and the handgun. The jury convicted Mattox of aiding and abetting reckless second-degree murder and criminal discharge of a firearm. Based upon Mattox's criminal history classification, the court sentenced him to a controlling 176-month prison sentence.

## ANALYSIS

*Standard of Review*

In reviewing a trial court decision regarding the suppression of an accused's statements and evidence obtained as a result of those statements, we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment. See *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003). We do not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005).

Issue One: *Did the district court err in admitting Mattox's statements to Douglas County Sheriff's Office booking officer Mark Unruh?*

Mattox argues that the district court erred in admitting his statements to Unruh because he had earlier invoked his right to counsel when speaking with Officer Guile. Specifically, he contends that the district court failed to sufficiently analyze whether he had voluntarily waived his right. The State responds that Mattox's statements are admissible because he reinitiated contact with law enforcement, *i.e.*, Unruh, and then voluntarily waived his rights to counsel.

Recently, in *Walker*, 276 Kan. 939, this court addressed the law relating to custodial interrogations after a defendant's assertion of his or her right to counsel:

"The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1601 (1966). . . .

. . . .

"Once the right to counsel has been invoked, the courts impose a 'relatively rigid requirement that interrogation must cease . . . .' [Citation omitted.] Questioning can be resumed only after a lawyer has been made available or the suspect reinitiates conversation. *Edwards v. Arizona*, 451 U.S. at 482, 484-85; *Henry*, 273 Kan. at 613. The *Edwards* rule provides a 'second layer of prophylaxis for the *Miranda* right to counsel' [citation omitted] which is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' (*Michigan v. Harvey*, 494 U.S. 344, 350, 108 L. Ed. 2d 293, 110 S. Ct. 1176 [1990].) See *Henry*, 273 Kan. at 613." 276 Kan. at 944-46.

We made clear in *Walker* that our analysis of whether custodial interrogation is appropriate after a suspect has invoked his or her right to counsel is two-fold:

"In determining whether an accused has waived a previously asserted constitutional right, the court must . . . determine whether the accused (1) initiated further discussions with police and (2) knowingly and intelligently waived the previously asserted right. *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). The prosecution has the burden to show that subsequent events indicated a waiver of a previously asserted right and that the waiver was knowing, voluntary, and intelligent under the totality of the circumstances. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983); *State v. Matson*, 260 Kan. 366, 374, 921 P.2d 790 (1996). A valid waiver of a previously asserted right 'cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights.' *Edwards*, 451 U.S. at 484. Further, the accused's statements must evince 'a willingness and a desire for a generalized discussion about the investigation' and 'not merely [be] a necessary inquiry arising out of the incidents of the custodial relationship.' *Bradshaw*, 462 U.S. at 1045-46." *State v. Walker*, 276 Kan. at 946-47.

In a 16-page Memorandum and Order dated February 14, 2002, the district court performed this two-step analysis. It "found and concluded" that Mattox initiated the communication and voluntarily and validly waived his right to remain silent and his right to counsel; as a result, Mattox's oral statements to Unruh and his written statement were admissible. The Court of Appeals affirmed.

Substantial competent evidence supports the district court's finding that Mattox initiated the communication. Unruh testified at the suppression hearing that during the booking, Mattox was persistent in trying to talk to him about "some information," *i.e.*, he broached the subject five to six times. At one point, Mattox got angry because Unruh would not listen. After being repeatedly put off because Unruh said he was not the person to receive such information, Mattox again approached Unruh after Mattox's shower and asked, "Are you ready to listen to me yet?" Unruh testified that Mattox then asked to go to a private room and there began to talk about three different murders, including his own brother's.

With a substantiated finding that Mattox initiated the communication, our next inquiry is

" 'whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' *Edwards v. Arizona,* 451 U.S. at 486, n. 9. As we have said many times before, this determination depends upon ' "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." ' [Citations omitted.]" *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983).

But first, an examination of our standard of review of the *Miranda* rights waiver issue is in order. This court recently reaffirmed that after we look to see whether the trial court's findings regarding confessions are supported by substantial competent evidence, our subsequent determination of whether the confession was voluntary — based upon that totality of factual circumstances — is a legal conclusion requiring de novo review. *State v. Swanigan,* 279 Kan. 18, 31, 106 P.3d 39 (2005); see *Arizona v. Fulminante,* 499 U.S. 279, 287, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991); *State v. Makthepharak,* 276 Kan. 563, 567, 78 P.3d 412 (2003); *State v. Vandiver,* 257 Kan. 53, 57, 891 P.2d 350 (1995).

By contrast, we have held that the often-related question of whether a waiver of *Miranda* rights was knowing, voluntary, and intelligent — also based upon the totality of factual circumstances

— is a question of fact. See *State v. Mays,* 277 Kan. 359, 372-73, 85 P.3d 1208 (2004); *Makthepharak,* 276 Kan. at 567. Accordingly, our review has been limited to determining whether substantial competent evidence exists to support the trial court's findings of voluntary, knowing, and intelligent waiver. *Makthepharak,* 276 Kan. at 567.

We observe, however, that all the federal circuit courts of appeal regard the voluntariness of a waiver of *Miranda* rights as an issue of law. As stated by the Seventh Circuit in *United States v. Mills,* 122 F.3d 346, 349 (7th Cir. 1997):

"On the issue before us today, the voluntariness of the waiver of *Miranda* rights, the other circuits also are of one mind and employ the same paradigm as they do for assessing the voluntariness of a defendant's statement. We stand alone in using a deferential standard of review with respect to the ultimate issue of voluntariness."

The Seventh Circuit then concluded:

"We believe that *Ornelas* [*v. United States,* 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996)] makes it clear that we ought to join the rest of the Country in holding that the ultimate issue of the voluntariness of a waiver of *Miranda* rights ought to be reviewed de novo by an appellate court. Like the issue of the voluntariness of a defendant's statement, the voluntariness of a *Miranda* waiver requires assessment of the historical facts of the case in light of a prevailing legal standard. Like the issue . . . in *Ornelas,* independent review is necessary to ensure uniformity of decision and the predictability and ease of administration that follow from uniformity of decision. Nevertheless, as the Supreme Court did in *Ornelas* . . . , we emphasize that the findings of historical fact and the reasonable inferences that the trier of fact draws from those findings are matters on which we owe deference." 122 F.3d at 350.

We agree with the federal circuit courts of appeal. We acknowledge that the judicial determinations of the two issues usually are separate, *i.e.,* one can make a voluntary waiver of his or her *Miranda* rights but still produce an involuntary confession. See *Baskin v. Clark,* 956 F.2d 142, 145 (7th Cir. 1992). We also acknowledge, however, that when dealing with an implied — as opposed to an explicit — waiver, the issue of whether the defendant waived his or her *Miranda* rights can be virtually indistinguishable from the issue of whether the defendant's statement was voluntary. See *United States v. Mills,* 122 F.3d 346, 351 (7th Cir. 1997). It is

therefore particularly appropriate, under these circumstances, that the same standard of review be applied to both issues. We so clarify our language in cases such as *Mays* and *Makthepharak*.

We reject Mattox's allegation that the district court failed to sufficiently analyze whether he had voluntarily waived his *Miranda*-based rights to silence and to counsel. Clearly, in its determination the court considered "the necessary fact that the accused, not the police, reopened the dialogue with authorities" (see *Edwards v. Arizona*, 451 U.S. 477) and found — based upon Unruh's testimony — that Mattox insisted on telling his story to Unruh about three different murders. The court also found that Unruh's statements were not evocative, *i.e.*, he primarily allowed Mattox to unburden himself of Mattox's own accord. The court further found that Mattox was properly advised of his *Miranda* rights; that he understood them; that Mattox was 22 years old; and that he had 2 years of college education. The district court additionally found no evidence of odor of alcohol or drugs, *i.e.*, that Mattox was not under their influence.

These findings are supported by substantial competent evidence. Guile testified that he read the *Miranda* warnings and that Mattox told him he understood them. He also testified that Mattox invoked his *Miranda* right to counsel, signifying Mattox indeed understood them, so Guile stopped his questioning. Furthermore, Mattox's age and education level were contained in the court file.

Additionally, Unruh testified at the suppression hearing that he let Mattox talk; he interrupted only to make sure he understood names, times, and locations. Unruh explained to Mattox that he was taking notes so he could relay the murder information to Detective Massey, an investigating detective, and that Mattox did not object. In short, Mattox knew that the information would be forwarded to additional law enforcement personnel for action, and he apparently approved. When Mattox was finished, Unruh went over the information to make sure everything was correct, and Mattox had no objection to this procedure either. Nor did Mattox ask for corrections, additions, or deletions, except to repeat that he had not shot Lane.

Unruh also testified that while he was writing the report, he gave Mattox a pencil and a piece of paper and told him he could write his story down in his own words and that Mattox's statement would be attached to his report for the detectives. Accordingly, Mattox knew that his own words also would be forwarded to other law enforcement personnel for possible action. Mattox wrote and even asked for an eraser and another pencil to complete his task. Mattox was writing the entire time Unruh was typing his report and after Unruh took Mattox to a holding cell, Mattox continued to write, apparently on his own, because Unruh by then had left the building.

We also observe there is no evidence in the record on appeal of any drug or alcohol odor on Mattox, no evidence indicating he was under the influence, and no evidence of threats, promises, or inducements for Mattox to talk.

The district court concluded that not only were Mattox's *Miranda* rights validly waived but that he also gave a knowing and voluntary confession.

We agree. The district court's substantiated findings permit us to independently conclude that, under the totality of the circumstances, Mattox's *Miranda* rights were knowingly and voluntarily waived, and his two confessions — oral and written — were voluntarily and knowingly given. *Cf. United States v. Mills,* 122 F.3d 346, 351 (7th Cir. 1997) (the two inquiries can be virtually indistinguishable).

*State v. William,* 248 Kan. 389, 807 P.2d 1292 (1991), also contains some parallels. There, this court held that although the defendant had court-appointed counsel after his first court appearance, he waived this Sixth Amendment right when he initiated contact with an employee at the sheriff's department and the employee "did not attempt to elicit confessional statements," but primarily listened to William's self-incriminating statements and asked a few clarifying questions. This court also held the trial court did not err when it concluded that the statements were voluntarily made and the statements were admitted into evidence. 248 Kan. at 413-14.

Issue Two: *Did the district court err in admitting Mattox's state-
ments to the Topeka Police Department detectives and Mattox's
handgun obtained as a result of those statements?*

Mattox argues that even a waiver of his *Miranda* rights with
Unruh does not allow the admission of his videotaped statement
and his handgun. He essentially argues an additional *Miranda*
warning should have been given by the Topeka detectives or a
determination made by them that Mattox fully understood his
rights. The State responds that Mattox's *Miranda* waiver continues
unless and until he reinvokes his rights.

The district court, in its five-page order of reconsideration of
March 22, 2002, held that Mattox had not made a clear request for
legal counsel during the interview with the Topeka detectives, cit-
ing *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S.
Ct. 1880 (1981), and *State v. Morris*, 255 Kan. 964, 880 P.2d 1244
(1994). Consequently, it held in relevant part:

"As previously determined, this court found the second interview was custodial.
The defendant after he had been previously *Mirandized* [by Officer Guile] vol-
untarily waived his right to remain silent.

"Therefore, the results of the second interview which was taped, should now
be admissible. That would include the tape itself and his second confession, also
the signed written statement and the gun should not now be required to be sup-
pressed.
. . . .

"The Topeka Police interview at Lawrence I.C. was found to be a continuation
of defendant's initiation of his confession with Officer Mark Unruh, after he had
been *Mirandized* earlier. The interview continued at 1:00 A.M. after defendant
had been talking to Officer Unruh and defendant completed his written statement
by signing it before the Topeka Detectives."

*Subsequent Miranda warning*

Inherent in the court's holding is a determination that given
Mattox's waiver with Unruh of his *Miranda* rights to counsel and
silence, there was no need for a subsequent *Miranda* warning by
the Topeka detectives. The Court of Appeals held:

"[T]he defendant's voluntary discussion with Unruh about the Lane shooting does
not allow law enforcement officers to presume that the defendant has categorically
waived a previously asserted right to counsel. If a person in custody who has
invoked the right to counsel initiates a general conversation concerning the

charged offenses with law enforcement officers, the State bears the burden of proving that the conversation was intended to be a knowing and intelligent waiver of the previously asserted right before statements made during a subsequent interrogation may be admitted. [Citations omitted.] In this case, the State has made no such showing.

. . . .

"The Topeka detectives, knowing that the defendant was in custody, made no attempt to ascertain whether the defendant was aware of his rights, let alone determine if the defendant wished to waive his previously invoked right to counsel. Instead, the detectives attempted to undermine the defendant's obvious reluctance to talk with the detectives by suggesting that the defendant's rights were not in jeopardy because he was merely a witness, not a suspect. . . .

. . . .

". . . It is clear from the videotaped interview with the Topeka detectives that the defendant's statements about the Lane shooting were not freely offered but were the product of the detectives' interrogation. As the State cannot demonstrate a knowing and intelligent waiver of the defendant's previously asserted right to counsel, these statements were admitted in violation of the defendant's constitutional rights." *Mattox*, No. 89,547, Slip op. at 6-7.

We begin our analysis by observing that one court has stated: "[T]here is no requirement that an accused be continually reminded of his rights once he has intelligently waived them. [Citation omitted.]" *United States v. Anthony*, 474 F.2d 770, 773 (5th Cir. 1973). The appellate courts of New York have refined the *Anthony* court's general statement by including a reasonable time factor: "When a person in continuous police custody receives *Miranda* warnings and voluntarily waives his rights, it is not necessary to repeat the warnings before later questioning within a reasonable time thereafter. [Citations omitted.]" *People v. Gonzalez*, 5 App. Div. 3d 696, 697, 774 N.Y.S.2d 739 (2004) (11 1/2 hours after first questioning defendant was reasonable); See *Zappulla v. New York*, 296 F. Supp. 2d 309, 317-18 (E.D.N.Y. 2003), *reversed on other grounds* 391 F.3d 462 [2d Cir. 2004]) (collecting cases).

See also *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (1-day interval between waiver of *Miranda* rights and defendant's statement to law enforcement was not unreasonable); *Ballard v. Johnson*, 821 F.2d 568, 571-72 (11th Cir. 1987) (3- to 4-hour gap between waiver of *Miranda* rights and third confession in another city was not unreasonable); *Evans v. Cotter*, 790 F.2d

1232 (5th Cir. 1986) (several-hours' gap between waiver of *Miranda* rights and confession not unreasonable); *Stumes v. Solem,* 752 F.2d 317, 320 (8th Cir. 1985) (5-hour interval between waiver of *Miranda* rights and defendant's statement to law enforcement not unreasonable).

On the issue of repeated *Miranda* warnings, this court has generally held:

"[O]nce the mandate of *Miranda* is complied with at the threshold of the interrogation by law enforcement officers, the warnings need not be repeated at the beginning of each successive interview. To adopt an automatic second warning system would be to add a perfunctory ritual to police procedures rather than provide the meaningful set of procedural safeguards envisioned by *Miranda.* [Citations omitted.]" *State v. Boyle,* 207 Kan. 833, 841, 486 P.2d 849 (1971).

See *State v. Pyle,* 216 Kan. 423, Syl. ¶ 9, 532 P.2d 1309 (1975) ("Once a suspect is fully advised of his rights and fully understands them, it is not necessary to give repeated *Miranda* warnings each time he is interviewed.").

*State v. Davis,* 268 Kan. 661, 998 P.2d 1127 (2000), contains a number of parallels to the instant case. There, the 17-year-old defendant was convicted of first-degree felony murder, attempted first-degree murder, aggravated robbery, and aggravated burglary in a Manhattan shooting. Prior to trial, he filed a motion to suppress statements he made to police officers. At the hearing, testimony was received that prior to the defendant's questioning, he was advised of his *Miranda* rights and that he waived them in writing. During the initial questioning, the officers left defendant alone to cool off. One of the officers testified that he was later summoned to the interview room by defendant who then stated that "he had to tell the story." 268 Kan. at 665. Although the opinion is silent as to details, it appears defendant then described his participation in the crimes. The trial court denied the motion to suppress, and his confession was admitted at trial over his objection.

At trial, the State also sought to introduce the testimony of Mark Bejot, a youth care worker at a juvenile detention center who had participated in the intake of the defendant. Over defense objection that Bejot had not *Mirandized* the defendant, the trial court allowed Bejot to testify that he had asked the defendant to explain

his arrest. The defendant told Bejot he was charged with attempted murder. Bejot then asked the defendant why, and the defendant replied that two individuals had called him a "nigger" and he had then shot the man five times and the woman in the head. 268 Kan. at 668. At trial, the defendant testified to deny he had done any of the shooting and said that his comments to Bejot were just "sarcastic." 268 Kan. at 669.

On appeal, defendant argued, among other things, that the trial court had erred in admitting the Bejot testimony. This court held there was no error:

"A *Miranda* warning must be given prior to any type of custodial interrogation. *State v. Clemons,* 251 Kan. 473, 480, 836 P.2d 1147 (1992). The requirements of *Miranda* apply when an accused is interrogated by law enforcement officers or their agents. See *State v. Pursley,* 238 Kan. 253, 259-60, 710 P.2d 1231 (1985).

"The record shows that the defendant was last advised of his rights by Detective Shuck [of the Manhattan Police Department] at 5:44 a.m. in Manhattan. He was then taken to Junction City where Bejot began the intake process at 12:13 p.m. [6 ½ hours later], and the defendant made the statement in question. In *State v. Boyle,* 207 Kan. 833, 841, 486 P.2d 849 (1971), we held that once the mandate of *Miranda* is complied with at the threshold of the interrogation by law enforcement officers, the warnings need not be repeated at the beginning of each successive interview. While Kansas has not addressed the exact issue involved here, other courts have held that the mere passage of time between *Miranda* warnings and interrogation need not render a confession inadmissible. See *State v. Trostle,* 191 Ariz. 4, 14, 951 P.2d 869 (1997); *State v. Rowe,* 479 A.2d 1296, 1299 (Me. 1984). Further, the mere fact that different law enforcement officers were doing the questioning does not make the confession inadmissible. See *Mainor v. State,* 259 Ga. 803, 804-05, 387 S.E.2d 882 (1990).

"This case represents a closer question. We are faced with a juvenile defendant who had already given his confession [and voluntarily waived his *Miranda* rights] and was then taken to a detention center in a separate location where he was again asked questions, not by a police detective, but by a detention center worker. However, given his [prior] experience with law enforcement officers and looking at the totality of the circumstances, we conclude that the trial court did not err in finding the defendant's statements to Bejot admissible." 268 Kan. at 678.

Our court applied a "totality of the circumstances" review of the facts and concluded that Davis' statements to Bejot were admissible. This impliedly includes a determination that under the totality of the circumstances, these statements were voluntarily and knowingly given and that the *Miranda* warning and waiver from

6 ½ hours earlier were still valid. See *State v. Swanigan,* 279 Kan. 18, 31, 106 P.3d 39 (2005) (totality of circumstances used to determine whether confession was voluntary); *Cf. State v. Makthepharak,* 276 Kan. 563, 567, 78 P.3d 412 (2003) (totality of circumstances used to determine whether *Miranda* waiver was voluntary, knowing, and intelligent); see *e.g., United States v. Andaverde,* 64 F.3d 1305, 1313 (9th Cir. 1995) ("Under the circumstances here, the 1-day interval between *Miranda* warning and waiver and [defendant's] October 28 statement to [law enforcement] was not unreasonable"; *Miranda* warning still valid and statement voluntarily given); *United States v. Nordling,* 804 F.2d 1466, 1471 (9th Cir. 1986) ("Evaluating the totality of the circumstances, we conclude that there was no need for NTF agents to administer new *Miranda* warnings in this case."); *Stumes v. Solem,* 752 F.2d 317, 320 (8th Cir. 1985) ("The nearly five-hour break between the interviews does not of itself invalidate the initial waiver. The significance of this elapsed time must be assessed in view of [defendant's] knowledge and conduct and other relevant circumstances."); *Brown v. State,* 661 P.2d 1024, 1030 (Wyo. 1983) (totality of circumstances considered to determine "whether the prior *Miranda* warnings were effective to sufficiently advise the accused of his constitutional rights so that the prior voluntary and knowing waiver of those rights continued its efficacy").

Applying this totality approach to Mattox's statements to the Topeka detectives, we first reiterate that the district court found that Mattox was 22 years old and had 2 years of college. It found no smell of alcohol or drugs and noted that Mattox had been *Mirandized* at 4:30 p.m. and that he understood his rights. It found that after invoking his rights to counsel and silence, Mattox voluntarily waived them around 7:30 p.m. by repeatedly initiating communication with Unruh and by providing information to him, both orally and in writing. Unruh's statements were not evocative. As mentioned, these findings are supported by substantial competent evidence. We also again observe that there was no evidence in the record on appeal of threats, promises, or inducements for Mattox to talk.

·We also reiterate that the evidence reveals Mattox had no objection to Unruh taking notes or to Unruh reviewing his notes and report with Mattox to ensure their accuracy. Mattox did not ask for corrections, additions, or deletions; he only reminded Unruh he had not committed the Lane shooting. He also knew that Unruh would pass on this murder information to the detectives for action, and he still had no objection. The evidence reveals that Mattox wrote out his own statement about the murders knowing it too would be given to law enforcement personnel for possible action and, because Unruh had left the building at midnight, Mattox apparently completed his statement in his cell without supervision. Moreover, at 12:55 a.m. he then took his now-completed written statement about the Lane murder with him to meet with the Topeka detectives who were there to interview him — about the Lane murder. The detectives identified themselves, told Mattox they believed he had information about a Topeka homicide, and began asking about the Lane murder. A number of these facts also constitute substantial competent evidence to support the trial court's finding that the second interview was a continuation of the first.

In short, these facts demonstrate that despite Mattox's knowledge of his *Miranda* rights and his knowledge that his information would be given to detectives, at approximately 9:21 p.m., he began a virtually uninterrupted series of voluntary acts. During these acts, continuing over several hours time, he either was providing, or preparing to provide, information to law enforcement about the Lane murder.

We conclude as a matter of law that under these circumstances, a second *Miranda* warning when Mattox arrived at the interview room was not required. Nor was an explanation of Mattox's *Miranda* rights required of the Topeka detectives, as Mattox alleged at oral arguments, because he knew his rights. As he told the detectives, "I know I need to talk to a lawyer, because I know anything I say y'all are going to twist it." Nevertheless, they reminded him he had the same rights as on TV, *i.e.*, the same rights he had invoked at 4:30 and then waived at 7:30 approximately 5 ½ hours earlier. He then replied, "So I'm not under arrest for it? Right."

We interpret his response as confirmation he again understood his *Miranda* rights.

*Clear request for counsel*

The basis for the district court's granting of the State's motion for reconsideration was its determination that during Mattox's interview with the Topeka detectives, he did not make a clear request for legal counsel. While Mattox argued this alleged error to the Court of Appeals as an alternate basis for suppressing the evidence obtained by the detectives, on appeal to this court his brief simply states in his presentation of the issue: "Alternatively, detectives wrongly continued to interrogate Michael after he clearly invoked his right to counsel." Rather than arguing this issue, however, he merely alleges that "as an initial matter, unless Michael at some point clearly and affirmatively knowingly waived his rights, such an analysis is moot. Michael's response and the detective's reply is clear evidence that Michael was not aware of his rights and that detectives did nothing to remedy that fact." Additionally, no oral argument was made before this court on this issue.

Similarly, the State does not address the issue in its brief to this court. It merely argues that Mattox's waiver continued unless and until he clearly and unequivocally reinvoked his rights. It does not discuss whether he reinvoked them. We consider the issue of Mattox's possible reinvocation of his right to counsel as abandoned. See *McGinley v. Bank of America,* 279 Kan. 426, Syl. ¶ 4, 109 P.3d 1146 (2005) (A point raised only incidentally in a party's brief but not argued in the brief is deemed abandoned.).

Issue Three: *Did an independent basis for admitting Mattox's handgun exist under United States v. Patane?*

The State argues that if the statement to the Topeka detectives is suppressed, the Smith and Wesson .380 handgun found as a result of that interrogation should not be suppressed, citing *United States v. Patane,* 542 U.S. 630, 159 L. Ed. 2d 667, 124 S. Ct. 2620 (2004). Given our affirmance of the district court on the handgun issue, the *Patane*-based argument is moot.

The decision of the Court of Appeals is affirmed in part and reversed in part. The decision of the district court is affirmed.

GERNON, J., not participating.
LARSON, S.J., assigned.
ALLEGRUCCI, J., dissenting.