NOT DESIGNATED FOR PUBLICATION

No. 114,771

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EDMUND ALEXANDER HAMLIN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed April 21, 2017. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, senior assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., GREEN, J., and BURGESS, S.J.

*Per Curiam*:  Edmund Alexander Hamlin was convicted of attempted intentional second-degree murder following a jury trial. Hamlin appeals claiming the district court erred by failing to suppress statements he made to police while under the influence of drugs and alcohol, in excluding part of his defense as not relevant, and by not allowing an attempted voluntary manslaughter jury instruction. Furthermore, Hamlin alleges these errors, while possibly harmless on their own, led to a cumulative error causing him to be deprived of a fair trial. Finding no errors we affirm the district court.

1

FACTUAL AND PROCEDURAL BACKGROUND

Hamlin was charged with intentional attempted murder in the second degree, possession of a hallucinogenic drug, and an alternative count of intentional aggravated battery causing great bodily harm or disfigurement for an incident that occurred July 30, 2014, in Topeka, Kansas. Prior to the incident, Hamlin had begun a relationship with Dawn Scott in May 2014. Early on in the relationship, Hamlin allowed Scott to move in with him in an effort to remove her from an abusive relationship. Around 2 months later, the relationship was not working and Hamlin gave Scott 30 days to leave his house. Scott found a new residence and moved on July 22, 2014. Hamlin helped Scott move.

On July 29, 2014, Hamlin had a conversation with Scott via text message while he was at work. The two planned to meet up that day, and Hamlin was especially looking forward to it because Scott had psychedelic mushrooms. Hamlin stated he had "always wanted to go on that little spiritual journey, to take some mushrooms, and get to soul search a little bit deeper." After arriving at Scott's house early that evening, Hamlin and Scott first went to the Dutch Goose to have a few drinks. On the way back to Scott's house, an 18-pack of Coors Light was purchased. Scott already had a box of wine and a bottle of liquor at her house. In addition to the psychedelic mushrooms, marijuana, Xanax, and Klonopin were present at Scott's residence. Upon returning to Scott's house, Hamlin was drinking, and he stated he "took a variety of everything" and smoked marijuana. Hamlin further stated that for every one pill he would take, Scott would take three. Scott stated she smoked marijuana, partook in the psychedelic mushrooms, and was buzzed from drinking.

After partaking in the various drugs, Hamlin began to work on his truck. Hamlin drank beer throughout the evening. Hamlin stated he wanted to go home after Scott "became very clingy" and called a tow truck to take him and his truck back to his house. When the tow truck arrived, though, Scott's SUV was parked in front of Hamlin's truck

2

and the keys could not be found. This meant Hamlin's truck could not be towed. Hamlin and Scott had an argument over this, which Scott characterized as not being a "big huge argument" and did not last long. Scott stated, "We really didn't do much arguing, to be honest." It is unclear when this occurred, but Scott's neighbor across the street, Matt Kreutzer, heard hollering when he arrived home about 10 p.m. that evening.

It is unclear what happened from the time of the argument until around 4 a.m. the next morning. Hamlin was apparently working on his truck and hanging out outside while Scott was inside putting her belongings away from the recent move. Sometime after 4 a.m. the next morning, Scott was on her couch and Hamlin was standing by the front door when Scott felt something hit her head. Scott asked Hamlin what was hitting her and received no response. The next thing Scott knew Hamlin was on top of her and she was knocked unconscious within "[m]aybe ten seconds." Scott believed she was being hit by Hamlin's forearm or elbow. Scott asked Hamlin to stop with no response before losing consciousness.

Scott came to on her living room floor in a puddle of her own blood. Scott stated she was choking on her blood, which caused her to regain consciousness. Scott heard footsteps heading toward the kitchen and realized she had an opportunity to escape. She ran out her front door and to her neighbor's house across the street. Scott began banging on her neighbor's front door for help. As Scott sought help, Hamlin exited the house following Scott across the street. Scott noticed Hamlin walking across the street calling her name in a tone she described as "very scary." Scott said she was "going in and out" of consciousness but remembers red and blue lights coming toward her, and at that point her "body basically gave [up]."

Kreutzer, Scott's neighbor across the street, was awakened by someone pounding on his front door. Kreutzer testified he heard a male voice and another individual that sounded as if "they were going to throw up." Kreutzer stated the male was telling the

3

other individual that he could not call because his phone was dead. Kreutzer called 911. Scott's next door neighbor, Lindsay Haight testified she "was awoken by crashing and other various noises and yelling." Haight observed Scott "[i]n the street . . . screaming for help." Haight watched Scott go to Kreutzer's house and begin to bang on his door. Haight testified she heard Scott yelling, "'Somebody help me. He's going to F'ing kill me.'" Lastly, Haight saw Hamlin exit Scott's residence and start walking in the direction of the street, calling out Scott's name. Haight phoned the authorities.

Hamlin maintained at trial that he was already outside when Scott exited her residence and went to Kreutzer's house across the street. Hamlin stated he walked over to Scott and "she just collapsed in [his] arms." Hamlin tried to assist Scott using his training as a Marine until police arrived. Hamlin would have called authorities himself, however his phone was dead. Hamlin maintained he was banging on Kreutzer's door as well in an effort to get Scott help.

Officer Matthew Rose arrived on the scene at 5:36 a.m. with Hamlin flagging him down. Officer Rose testified that Hamlin stated he was Scott's ex-boyfriend and was "trying to stop the bleeding" but was experiencing some difficulty in doing so. Scott was on Kreutzer's front porch when Officer Rose arrived. Officer Rose observed Scott was "having a difficult time breathing." When Officer Rose asked Scott who had caused her injuries, she pointed at Hamlin and stated, "'He's dangerous and he's trying to kill me.'" The officer immediately took Hamlin into custody without incident. Officer Rose testified as he was placing Hamlin in his patrol vehicle Hamlin stated, "'I'm not sure what's going on, I know she's crazy, and I think that's theater blood.'" Officer Rose testified Scott was "completely covered in blood" to the point the officer could not "see any of her skin at all." When the officer returned to the porch he found Scott "lying almost face down on the porch," and Officer Rose was concerned about Scott aspirating on her blood. Officer Rose rolled Scott "on to her side" to assist her breathing and attended to her until paramedics arrived.

4

Field training paramedic Andrea Ayers responded to the call for Scott at 5:40 a.m. Ayers noticed Scott was "covered in blood" to the point "it was difficult to see if there were any other injuries" other than the "full thickness laceration on [Scott's] forehead." Scott was bleeding so profusely that Ayers was covered to the point of "having to take a shower and change" clothes following transporting Scott to the hospital. Upon arrival at the hospital, Scott began to "posture" which is "the beginning of seizing when someone has a bad head injury." Scott testified to the extent of her injuries at trial stating, "I had— my forehead was cut open, I had cuts and bruises and stuff everywhere. End result, I am epileptic and seizures [*sic*] and I'm on medication." Scott continues to have seizures as a result of the altercation.

Hamlin was originally charged with attempted second-degree murder, aggravated burglary, and possession of a hallucinogenic drug. Prior to trial, those charges were amended on April 17, 2015, to attempted murder in the second degree, possession of a hallucinogenic drug, and an alternative count of intentional aggravated battery causing great bodily harm or disfigurement. On February 20, 2015, Hamlin filed a motion in limine, motion for sequestration, motion to extend motion deadline, and motion to suppress statements. In the motion to suppress statements, Hamlin alleged that when interviewed by police, he had "been up for a period of time" making him "very tired" and was also "under the influence." Additionally, Hamlin alleged "[h]e was kept in the interview room for an extensive length of time." With this in mind, Hamlin maintained "he did not provide a knowing and intelligent waiver of his right to remain silent."

A motions hearing was held on April 13, 2015, and completed on April 15, 2015, in order to allow Hamlin the opportunity to play the interview for the district court. Hamlin's interview at the police station started at 8:54 the morning of the incident. Detective Lawrence Falley stated Hamlin seemd to understand the waiving of his *Miranda* rights. Detective Falley indicated Hamlin gave answers to some questions that were not "reality" to the detective, and Hamlin "had some questioning that was different."

5

Detective Falley testified Hamlin was "[d]efinitely . . . under the influence, but to what extent I had no knowledge on that" and had "an odor of alcohol." Detective Falley noted that Hamlin indicated he had consumed five beers and "a white coffee creamer stuff." Detective Lance Green also indicated that Hamlin seemed to understand his *Miranda* rights. Detective Green had no problem understanding Hamlin's answers to questions. Detective Green, while admitting Hamlin "appeared to have been drinking," did not think Hamlin was "intoxicated to a high level." Officer Rose testified Hamlin had "erratic behavior that progressively got worse" and described the behavior as "someone under the influence of methamphetamine or some sort of hallucinogenic drug." The district court admitted the statements made during Hamlin's interview with police, finding he voluntarily waived his *Miranda* rights and voluntarily made statements to the police.

A jury trial was held May 18-20, 2015, and Hamlin was found guilty of attempted second-degree murder and aggravated battery. At trial, the State dismissed the possession charge. At sentencing, on June 25, 2015, the district court dismissed the alternative count of aggravated battery. Hamlin was sentenced to 71 months' imprisonment for attempted second-degree murder. Hamlin timely filed his notice of appeal on June 26, 2015.

## DID THE DISTRICT COURT ERR IN FAILING TO SUPPRESS HAMLIN'S STATEMENT MADE TO POLICE?

Hamlin contends "[t]he district court erred by failing to suppress [custodial] statements" he made while "under the influence of alcohol and hallucinogenic mushrooms." Hamlin asserts that whether a statement is voluntary is evaluated by looking at the totality of the circumstances. Citing *State v. Wakefield*, 267 Kan. 116, 126, 977 P.2d 941 (1999), Hamlin maintains four factors should be considered to make this determination: "(1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation." Hamlin

6

claims this is ultimately a question of "whether the confession was the product of the free and independent will of the accused," citing *State v. Harris*, 284 Kan. 560, Syl. ¶ 10, 162 P.3d 28 (2007). Hamlin maintains factors one and four are not in question, however, because he was intoxicated, the State could not prove "Hamlin's statements were the product of his free and independent will."

Hamlin cites a number of cases discussing intoxicated individuals and voluntary statements, in particular *State v. Sweat*, 30 Kan. App. 2d 756, 48 P.3d 8 (2002), and *State v. Norris*, 244 Kan. 326, 768 P.2d 296 (1989). While the cases Hamlin cites stand for the premise that a person who does not appear intoxicated cannot claim his or her statement was involuntary, Hamlin maintains this is not what happened in this case. Hamlin asserts that officers in this case believed he was intoxicated. Hamlin contends "the [S]tate has the burden to show that such intoxication did not render Mr. Hamlin incapable of understanding what he said and did." Hamlin argues his statements simply could not have been voluntary and the use of such "statements violates the Due Process Clause" necessitating his conviction being reversed.

The State contends the district court's denial of the motion to suppress was proper. Citing *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), the State asserts there are two factors to be "considered when deciding" if an individual "voluntarily waives his or her *Miranda* rights." The State notes one is "free and independent will," which Hamlin argues is lacking because of intoxication. The State contends "Hamlin's statements were freely and voluntarily given." The State maintains both detectives thought Hamlin had been drinking but was still cognizant enough to properly understand and answer questions.

Citing *State v. Gilliland*, 294 Kan. 519, 276 P.3d 165 (2012), the State contends an individual using drugs or drinking does not mean statements are involuntary. Instead, "[a]ll circumstances surrounding the giving of the statement must be examined." The

7

State asserts that looking at all of the circumstances of this case, Hamlin's statement was voluntary. Lastly, the State contends even if the district court erred in denying the suppression motion, "the error was harmless." The State further notes that "even without the interview, the State's evidence was overwhelming against Hamlin."

This issue presents a two-part standard of review. *State v. Mattox*, 280 Kan. 473, Syl. ¶ 3, 124 P.3d 6 (2005).

> "An appellate court employs the same standard of review for determining the voluntariness of the waiver of *Miranda* rights as it does for assessing the voluntariness of a defendant's statement. The inquiry requires an examination of the totality of the circumstances, and an appellate court reviews the factual underpinnings of the trial court's decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." 280 Kan. 473, Syl. ¶ 3.

In this case, Hamlin only alleges his statements were involuntary, not that his *Miranda* waiver was involuntary.

Just because an individual has been using drugs or drinking does not equate to his or her action being involuntary. *Gilliland*, 294 Kan. 519, Syl. ¶ 5. "The fact that an accused had been drinking or using drugs does not per se establish involuntariness of the accused's confession. All circumstances surrounding the giving of the statement must be examined to determine if the intoxication prevented the accused from voluntarily making a statement." 294 Kan. 519, Syl. ¶ 5.

> "In determining voluntariness trial courts look at the totality of the circumstances surrounding the statement by considering six nonexclusive factors: '(1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's

8

fluency with the English language.'" *State v. Walker*, 304 Kan. 441, 449, 372 P.3d 1147 (2016).

In this case, Hamlin is solely claiming factor one was lacking.

Kansas courts have consistently held that intoxication is not enough to render statements involuntary. *Walker*, 304 Kan. at 450-51 (although defendant claimed to have drank "12 or 13 32-ounce cans of beer," detectives noticed no "signs of intoxication" and smelled no alcohol making defendant's statements voluntary); *State v. Betancourt*, 301 Kan. 282, 291-92, 342 P.3d 916 (2015) (defendant having alcohol and cocaine in his system did not render statements involuntary, especially without manifestation of effects of drugs or alcohol); *State v. Gibson*, 299 Kan. 207, 218-19, 322 P.3d 389 (2014) (use of marijuana 3 hours prior to contact with police did not render statements involuntary, especially when defendant responded affirmatively when asked if he understood questions); *Gilliland*, 294 Kan. at 532 (defendant's statements were voluntary when he "did not exhibit any physical signs of intoxication, except an odor of alcohol"); *State v. Jacques*, 270 Kan. 173, 184-85, 189, 14 P.3d 409 (2000) (defendant's use of crank, morphine, and cocaine did not render statements involuntary when defendant answered "questions in a coherent manner, follow[ed] the conversation, [understood] what was being asked of him, had experience with the *Miranda* form, and had been questioned by the police on a previous occasion").

There is little doubt that Hamlin was under the influence of both drugs and alcohol at the time he was interviewed by police. Psychedelic mushrooms, marijuana, Xanax, and Klonopin were present at Scott's residence. While at Scott's house, Hamlin was drinking, stating he "took a variety of everything" and smoked marijuana. Detective Falley indicated Hamlin gave answers to some questions that were not "reality" to him and Hamlin "had some questioning that was different." Detective Falley stated Hamlin was "[d]efinitely . . . under the influence, but to what extent I had no knowledge on that" and

Hamlin had an "odor of alcohol." Detective Falley noted that Hamlin indicated he had consumed five beers and "a white coffee creamer stuff." Officer Rose testified Hamlin had "erratic behavior that progressively got worse" and described the behavior as "someone under the influence of methamphetamine or some sort of hallucinogenic drug."

However, Detective Falley testified that Hamlin seemed to understand the waiving of his *Miranda* rights. Detective Falley thought Hamlin understood questioning and "was able to answer." Detective Green also testified that Hamlin seemed to understand his *Miranda* rights. The detective had no problem understanding Hamlin's answers to questions, and he thought Hamlin was coherent and his answers went along with the conversation. Detective Green, while admitting Hamlin "appeared to have been drinking," did not think Hamlin was "intoxicated to a high level." In the recording of the interview, Hamlin goes from being highly intoxicated toward the beginning of the video and to seemingly near sobriety toward the end.

The video of Hamlin's statement to law enforcement officers is part of the record and is very revealing as to Hamlin's state of mind at the time of the statement. At the outset, the officer conducting the interview asked Hamlin about his alcohol intake because he smelled an odor of alcohol. But it is interesting to note that from the inception of the interview that while Hamlin was slow to respond to questions, all his answers were precise, responsive, and accurate. When asked about his last name, he accurately utilized the military alphabet to spell his name, *i.e.* "hotel, alpha," etc. When the officer referred to Hamlin by a shortened version of his first name, Hamlin quickly corrected the officer stating he preferred to be called by a shortened version of his middle name, Alex. During the course of the interview, Hamlin discussed his relationship with the victim in detail. Hamlin could recount a timeline of the evening and his actions during that time. He did not slur his words, and Hamlin did not ask for questions to be repeated.

10

An observer during the opening time frame of the interview might have questioned whether Hamlin was under the influence. However, within relatively short order, Hamlin became much more engaged and conversant. Hamlin was much more active and interactive. It is highly doubtful that a person could be too deeply under the influence and be as engaged as Hamlin was within such short order. The time frame in question would simply not have provided much time for a person to become sober. It should also be noted that while it is clear Hamlin ingested alcohol and mushrooms, it was approximately 10 hours between the time he last ingested the mushrooms and the time he was interviewed. Hamlin also stated that he believed the mushrooms had very little effect on him.

In observing Hamlin respond during the interview, one might question why he delayed so often in answering questions. However, in looking at the nature of many of those responses, it could be argued that Hamlin was being calculating in measuring his response. Hamlin was very definitely trying to paint the victim in an unflattering light while trying to not go too far over the line in bad-mouthing her.

In viewing the video, there is no question that some of Hamlin's behavior was odd, but that could be explained as a by-product of his personality. In all events, viewing the totality of the circumstances, there was competent evidence to support the district court's decision to overrule the motion to suppress. As such the claim that the district court's ruling would constitute harmless error is rendered moot.

DID THE DISTRICT COURT ERR IN EXCLUDING EVIDENCE FROM HAMLIN SUPPORTING DEFENSE THAT THE VICTIM HAD MOTIVE TO FALSIFY TESTIMONY?

Hamlin contends the district court was incorrect in "restricting defense counsel from presenting evidence in support of the defense that the complaining witness would have motive to falsify testimony." Hamlin made an effort to introduce evidence that the

11

keys to Hamlin's truck and "other property belonging to Mr. Hamlin turned up missing" when a "third party" went to Scott's house to retrieve Hamlin's truck. Hamlin was going to use this evidence "to show that [Scott] had a motive to keep [him] incarcerated." Hamlin claims Scott's ulterior motive was at issue, meaning the evidence was relevant to motive and admissible under K.S.A. 60-455. Hamlin asserts "[e]vidence does not have to be strong or overwhelming to be relevant." Hamline contends this error was not harmless "and requires a new trial." Hamlin claims "harmless error review is inapplicable when the district court's denial" of evidence "'does serious damage to the petitioner's defense,'" citing *Delaware v. Van Arsdall*, 475 U.S. 673, 683, 106 S. Ct. 1431, 896 Ed. 2d 674 (1986). Hamlin notes this may "include a witness' other ulterior motives," citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).

The State contends the district court properly excluded the evidence and maintains Hamlin's evidence on this point was simply not relevant. The State argues: "Testimony from [the third party], regarding an incident between her and Scott that happened days after the beating, was simply not relevant to the identity of who beat Scott and whether that was Hamlin or not." The State claims if the evidence is relevant, its prejudicial value far outweighs any probative value. The State maintains evidence meant to "attack Scott's credibility" is inadmissible if it is of an "individual's traits or character other than honest[y] or veracity or their opposite are inadmissible and evidence of specific instances of conduct tending to prove a trait of an individual's character are also inadmissible." Lastly, the State maintains the "exclusion of the evidence was harmless error."

"Relevant evidence is evidence that has '"any tendency in reason to prove any material fact."'" *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). "Relevance has two components:  materiality, which is reviewed de novo; and probativity, which is reviewed for abuse of discretion." 303 Kan. at 550-51. Evidence is material when the fact it supports is in dispute or in issue in the case. *State v. Bowen*, 299 Kan. 339, 348, 323

12

P.3d 853 (2014). "Evidence is probative if it has any tendency to prove any material fact." *State v. Dupree*, 304 Kan. 43, 64, 371 P.3d 862 (2016).

The evidence Hamlin sought to introduce in this case was the definition of irrelevant. Hamlin claims the evidence was material because it went to Scott's motive and should come in under K.S.A. 2016 Supp. 60-455. However, Scott's motive is not at issue in this case. The evidence is simply not material. Hamlin does not address whether the evidence is probative, but with Scott's motive not being a material fact, the evidence is also not probative. The evidence is not relevant in any way. Hamlin is attempting to imply that Scott either beat herself up, or had someone beat her up in order to falsely accuse Hamlin in an effort to steal his property. The absurdity of this argument and its lack of relevance is readily apparent. In the words of the district judge:

> "[U]nless you have this witness that's going to testify that Ms. Scott said I know the
> defendant didn't do it, but I'm going to keep his property and I'm going to keep him in
> jail, I don't think you have any direct evidence as to that. I think you're just trying to draw
> the implication by whatever confrontation is between the victim and this witness. So I
> don't find it's relevant . . . it won't be allowed."

## DID THE DISTRICT COURT ERR BY NOT GIVING A LESSER-INCLUDED OFFENSE INSTRUCTION FOR ATTEMPTED VOLUNTARY MANSLAUGHTER?

Hamlin contends the district court was incorrect in "failing to give a lesser-included offense instruction for attempted voluntary manslaughter." Hamlin argues that since "a lesser-included offense of intentional second-degree murder" is voluntary manslaughter, attempted voluntary manslaughter must be "a lesser-included offense of attempted second-degree murder." With this in mind, Hamlin maintains evidence of a sudden quarrel is all that is necessary. Hamlin asserts Scott's testimony at trial establishes an "'unforeseen angry altercation'" constituting a sudden quarrel (quoting *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 [2012]). Hamlin concludes that "a lesser-included

13

offense instruction for attempted voluntary manslaughter was both legally and factually appropriate" and the district court committed error in failing to "give the requested instruction."

The State contends the district court acted properly in denying the attempted voluntary manslaughter instruction. The State concedes that the issue was properly preserved for appeal and also concedes that the attempted voluntary manslaughter instruction was "legally appropriate." However, the State maintains evidence was lacking to support the attempted voluntary manslaughter instruction. The State argues there is no evidence that the altercation between Hamlin and Scott occurred as the result of Scott provoking Hamlin. The State points out that Hamlin's defense of being outside of the house while Scott was injured makes this instruction impossible. Lastly, the State asserts that if the instruction was improperly denied, the district court only committed a harmless error.

When analyzing denied jury instructions, an appellate court applies the following standard of review:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

14

See K.S.A. 2015 Supp. 22-3414(3).

The State concedes that the issue was properly preserved and the instruction was "legally appropriate." The issue in this case is whether sufficient evidence was present, "'viewed in the light most favorable to the defendant.'" *Fisher*, 304 Kan. at 257. More specifically, the issue in this case is Hamlin's contention that there was sufficient evidence of a "sudden quarrel."

> Kansas courts have provided a definition of sudden quarrel:

> "'Sudden quarrel is one form of provocation for "heat of passion" and is not separate and apart from "heat of passion." The provocation whether it be "sudden quarrel" or some other form of provocation must be sufficient to cause an ordinary man to lose control of his actions and his reason.'" *State v. Johnson*, 290 Kan. 1038, 1047, 236 P.3d 517 (2010).

While a rather ambiguous definition, one thing is certain, there must be provocation. 290 Kan. at 1047.

Hamlin fails to point to any evidence of provocation. In fact, it seems that Hamlin defines sudden quarrel as merely a confrontation that occurs suddenly without a need for provocation. As the State correctly states, "[t]here was no objective evidence of a provocation." Instead, Scott was on her couch and Hamlin was standing by the front door when Scott felt something hit her head. Scott asked Hamlin what was hitting her and received no response. The next thing Scott knew Hamlin was on top of her, and she was knocked unconscious within "[m]aybe ten seconds." The only evidence Hamlin presented is that he was already outside when Scott exited her residence and went to Kreutzer's house across the street, and he did not witness what happened to Scott. Neither account of what happened that night presents any evidence of provocation. Therefore, sufficient

15

evidence is absent and the district court properly denied Hamlin's request for the attempted voluntary manslaughter instruction. *Fisher*, 304 Kan. at 257.

DID CUMULATIVE ERROR DEPRIVE HAMLIN OF A FAIR TRIAL?

Hamlin contends that while the above three issues may have constituted harmless error on their own, taken as a whole they constitute cumulative error that "'denied [him] a fair trial'" (quoting *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 [1992]). The State argues "there [were] no errors, and the cumulative error doctrine [would] not apply."

The test for cumulative error "is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial under the totality of the circumstances." *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

> "In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial effort); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." 300 Kan. at 1007.

Having found that the district court has made no errors, cumulative error is absent.

Affirmed.

16