No. 101,078

MICHAEL K. MATTOX, *Appellee*, v. STATE OF KANSAS, *Appellant*.

(267 P.3d 746)

Opinion filed December 30, 2011.

*Alice White*, of Kansas Appellate Defender Office, argued the cause, and *Jean K. Gilles Phillips*, of the same office, was on the brief for appellee.

*Natalie Chalmers*, assistant district attorney, argued the cause, and *Jamie L. Karasek*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were on the brief for appellant.

The opinion of the court was delivered by

LEBEN, J.: Michael Mattox was convicted of aiding and abetting second-degree murder after he gave his loaded gun to Robert Gigger, who shot the victim, John Lane—immediately after Mattox said that Lane deserved to be shot at. After Mattox's conviction was upheld on appeal, he brought a habeas corpus action contending that some of the evidence against him would have been thrown out had his appellate lawyer made a better argument. But we do not set aside a conviction based on an attorney's inadequacy unless that failure affected the outcome, and there was abundant evidence of Mattox's guilt even without the evidence he now contends should have been excluded. Because the trial's outcome would have been the same even without the contested evidence, we reverse the district court's grant of habeas relief, which provided that Mattox be allowed to reopen his earlier appeal.

We begin by briefly reviewing the facts of Mattox's crimes and their investigation, which are set forth in greater detail in our opinion denying his direct appeal. See *State v. Mattox*, 280 Kan. 473, 474-80, 124 P.3d 6 (2005). When Topeka police officers responded to a call about gunshots at about 3 a.m. on October 11, 2001, they found a car stopped on the median of a divided Topeka roadway; the car was still running, but the driver, John Lane, was slumped over with two gunshot wounds to the head. He died a short time later at a hospital. Officers found shell casings on the roadway that suggested the shots had been fired from a moving vehicle, but they couldn't find any witnesses to the shooting.

Five days later, police officers arrested Mattox on unrelated charges at a Lawrence restaurant. Mattox was read his *Miranda* rights at the police station, and he said he wanted to speak with a lawyer rather than with officers. But while being booked into the jail on criminal-trespass charges, he continually told the booking officer, Mark Unruh, that he had some information he needed to tell Unruh. Unruh said several times that he wasn't the person to tell and that Mattox would need to talk to detectives. But Mattox persisted, and more than an hour later Unruh said that he would listen.

Mattox then related information about three different murders, including Lane's. Mattox said that he had been riding in a car driven by Gigger at about 3 a.m. when another car had pulled up next to them; he said Gigger had been agitated because the car had been swerving behind them. Mattox said that Gigger had asked for Mattox's gun, which Mattox then took out of the glove compartment. Gigger took the gun and shot Lane. Unruh typed up what Mattox had told him; he read it back to Mattox to confirm its accuracy. In the meantime, at Unruh's request, Mattox began writing out the story in his own handwriting. Mattox continued that handwritten version after he was taken to a cell, and Unruh left when his shift ended. In our earlier decision, we held that the statements Mattox made to Unruh—and his handwritten statement—were admissible because even though Mattox had initially invoked his *Miranda* rights, there was substantial evidence to sup-

port the district court's conclusion that Mattox had voluntarily initiated these communications. 280 Kan. at 482-85.

What is primarily challenged now are the statements Mattox made to Topeka detectives while still in custody, as well as any other evidence obtained based on those statements. Mattox argues that he reinvoked his *Miranda* rights shortly after he began speaking to the detectives, an argument that wasn't specifically pursued when his case reached this court on direct appeal. Mattox contends that had his attorney made the right argument in that appeal, this court would have held that Mattox's gun—the murder weapon—and evidence of the statements made to detectives were inadmissible. The State contends that Mattox's statements to the detectives about talking to a lawyer were ambiguous and thus he didn't reinvoke his *Miranda* rights. See *State v. Appleby*, 289 Kan. 1017, 1041, 221 P.3d 525 (2009) (finding that invocation of the *Miranda* right to consult an attorney during custodial interrogation must be unambiguous). But we have concluded that we need not resolve this dispute because even if we assume that some of the evidence should have been excluded, its exclusion wouldn't have affected the jury's verdict.

Before we go further, we must review the legal standards under which a defendant may gain a new trial based on the substandard performance of his or her attorney, as well as the standards that govern our review of the district court's ruling on this issue. On appeal, where the district court has made factual findings after an evidentiary hearing, as occurred here, we must accept those factual findings that are supported by substantial evidence. But the ultimate legal conclusions present mixed questions of law and fact, so we must review those conclusions independently, without any required deference to the district court. *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007); *Kargus v. State*, 284 Kan. 908, 917, 169 P.3d 307 (2007).

On the merits of an ineffective-assistance claim, the defendant has the burden to show two things: (1) that the attorney's work was below minimum standards and, thus, was constitutionally deficient; and (2) that the attorney's substandard work prejudiced the defense. The second part of the test ordinarily requires showing a

reasonable probability that the result of the trial would have been different but for the attorney's inadequate work. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984); *Harris v. State*, 288 Kan. 414, Syl. ¶¶ 2-3, 204 P.3d 557 (2009). We often refer to these two parts of the *Strickland* test as the performance prong and the prejudice prong. *E.g., Kargus*, 284 Kan. at 917.

The district court held that both prongs were met. First, Mattox's appellate attorney performed below constitutional standards by failing to pursue the reinvocation claim when his appeal reached this court after Mattox had initially been successful on appeal in the Court of Appeals. Second, there was a reasonable probability that Mattox would have been successful on appeal had the proper argument been made, thus causing prejudice to him.

In this case, Mattox's claim is that the attorney's inadequate work occurred on appeal, not at trial. Accordingly, the prejudice prong of the test is stated a bit differently than for trial errors. For an error on appeal, the defendant must show that but for counsel's inadequate work there was a reasonable probability that the appeal would have been successful. *Baker v. State*, 243 Kan. 1, 7, 755 P.2d 493 (1988).

At this point—for an alleged error by appellate counsel—the applicable standards become somewhat complicated because we must examine both the normal prejudice prong for an ineffective-assistance claim, which we have just described, and the standards that were applicable in the earlier appeal during which there is a claim of inadequate performance by the defendant's attorney. After all, the defendant must show a reasonable probability that he would have succeeded in the original appeal under whatever standards applied there.

So Mattox has the burden under *Strickland* to show that his attorney's inadequate performance affected the result of the appeal. But in the original appeal itself, had we determined that some evidence was admitted in error, we would then have had to determine whether this admission was harmless. In making that determination, because the defendant's constitutional right to consult an attorney was at issue, we would have had to have been able to

conclude beyond a reasonable doubt that the error hadn't affected the trial's outcome. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011). So it is in this context that we examine whether—ultimately—Mattox has demonstrated prejudice under *Strickland*.

We accept for argument's sake that Mattox did reinvoke his *Miranda* rights during the early stages of his interview with Topeka detectives. Based on that assumption, those statements would be inadmissible. In addition, Mattox agreed in that interview to show detectives where his gun had been discarded; after he did so, FBI tests showed that it was indeed the murder weapon. So Mattox argues that the gun and the tests showing that it was the murder weapon would also have been excluded under the present assumption.

But even without the videotaped statements to the detectives—and even the murder weapon that Mattox led detectives to—overwhelming evidence proved both of the charges against Mattox: aiding and abetting both second-degree murder and the criminal discharge of a firearm. Before Mattox spoke to the detectives, he had already admitted most of his conduct to Unruh, the booking officer. Mattox told Unruh:

- Mattox was riding in a car with Gigger when another car, driven by Lane, drove behind them and then pulled up beside them.
- Gigger told Mattox to get out the gun, and Mattox got the gun from the glove compartment.
- The gun was registered to Mattox.
- Gigger took the gun and shot Lane.

Mattox provided additional details in his written statement, including that he had reached into the trunk to get a clip of ammunition, that he had said to Gigger right before the shooting that Lane deserved to be shot at for driving like he was going to shoot at them, and that Gigger had shot Lane five or six times.

Mattox did contend in this appeal, especially in oral argument, that his written statement should have been inadmissible because he signed it and handed it to detectives after he had reinvoked his *Miranda* rights. But even when the district court before trial ini-

tially ruled in Mattox's favor in suppressing oral statements made to the detectives (a decision it reversed on reconsideration), the court ruled that Mattox's written statement would still be admitted. The only exception provided was that Mattox's signature on the statement, obtained by the detectives, would be removed. The district court found that Mattox had voluntarily written that statement and had voluntarily given it to the detectives, and in the present appeal Mattox has not shown that those findings were in error. Detective Brian Hill testified in the suppression hearing that Mattox had brought the written statement with him and laid it on the interview table. The district court found that the detectives did not have Mattox make any additions or deletions to the written statement while he met with them. Other than Mattox signing the statement at the end of his interview with detectives, the written statement was not tainted by any potential legal issues involved with the interview. We therefore conclude that the written statement was properly admissible in Mattox's trial.

There was additional evidence too. Officer Matt Sarna had arrested Mattox on suspicion of other crimes after finding him hiding in the kitchen of a restaurant after a call about a potential robbery nearby. He found an empty ammunition clip from a pistol in Mattox's coat pocket—of the same caliber as the bullets used to kill Lane. Detective Gary Robinson related that Latoya Owens had driven Mattox to Lawrence at some point between Lane's murder and Mattox's arrest at the restaurant. Owens told Robinson that while Mattox was with her, he had disposed of some bullets and an ammunition clip in a Lawrence storm drain. Robinson and another detective went to that storm drain with Owens, and they recovered a full ammunition magazine and four bullets, also of the same caliber used to kill Lane.

So even without the gun, there would have been a missing gun registered to Mattox of the same caliber as the bullets that killed Lane; bullets and a clip of the same caliber that Mattox threw away after the murder; and an empty clip of the same caliber still in Mattox's coat when he was arrested. Mattox had admitted that he had gotten his gun out of the glove compartment and had gotten ammunition from the trunk, that he had told Gigger that Lane

deserved to be shot at, and that Gigger had taken the gun and shot at Lane five or six times. No evidence was presented at trial—nor has any been suggested in this habeas proceeding—offering another version of these events.

But there is one more factor to be considered here: Mattox's argument that the gun would have been suppressed runs up against an insurmountable hurdle in the form of the United States Supreme Court's ruling in *United States v. Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004). In *Patane*, the Court held that physical evidence located as a result of a suspect's voluntary statements—made while the suspect was in custody but without *Miranda* warnings—still could be admitted at trial. The Court's rationale was that the introduction at trial of physical evidence did not bring into play *Miranda*'s protection against self-incrimination because physical evidence—not statements—was being introduced. 542 U.S. at 634, 643-44 (plurality opinion); 542 U.S. at 644-45 (Kennedy, J., joined by O'Connor, J., concurring).

The State argued in Mattox's original appeal that application of the *Patane* holding mandated that we conclude that the murder weapon was admissible even if Mattox's videotaped statement was not. We did not reach the issue because we separately concluded—with Mattox's attorney not pressing the argument that Mattox had reinvoked his *Miranda* rights—that the videotaped statements were admissible. Given that ruling, there was no cause in Mattox's earlier appeal to address the State's *Patane* argument, and we declined to do so. 280 Kan. at 492. Since then, relying on *Patane*, we have held in another case that physical evidence that comes to light as a result of a custodial interrogation held in violation of the *Miranda* rule need not be suppressed. *State v. Schultz*, 289 Kan. 334, Syl. ¶ 7, 212 P.3d 150 (2009). Here, the admission of Mattox's gun and the FBI ballistics-test results do not require the presentation of any of Mattox's statements that were arguably made after he had reinvoked his *Miranda* rights. We therefore conclude that even if Mattox did reinvoke his *Miranda* rights, neither the gun nor the ballistics-test results would have been suppressed.

When all of this evidence—including the gun and the ballistics evidence—is considered and compared to the elements of the

charges for which Mattox was convicted, the exclusion of his statements to detectives simply wouldn't have affected the jury's verdict. The State presented its case on the theory that Mattox had aided and abetted Gigger in committing two crimes: the criminal discharge of a firearm and murder. While the State sought a first-degree murder conviction, the jury convicted Mattox of aiding in the second-degree, unintentional murder of Lane, along with the firearm-discharge offense. To prove the second-degree murder charge, the State had to show that Mattox, through his own intentional acts, aided or counseled Gigger to kill Lane unintentionally but under circumstances in which he acted recklessly and showed extreme indifference to the value of human life. To prove the criminal-firearm-discharge offense, the State had to show that Mattox intentionally aided or counseled Gigger to discharge a firearm at an occupied motor vehicle, resulting in great bodily harm to Lane. Mattox admitted getting the gun out, loading it, and telling Gigger that Lane deserved to be shot at before Gigger fired the shots at Lane's car; Lane was struck twice in the head and killed. Even these admitted facts provided sufficient proof to convict on both charges.

Despite this evidence, the district court in the present habeas case concluded that Mattox would have succeeded in his appeal because a court could not have said beyond a reasonable doubt that Mattox would have been convicted had certain evidence been excluded. In its ruling, the district court cited the Court of Appeals' statement in Mattox's original appeal that, in this case, it could not find the improper admission of evidence harmless under constitutional harmless-error standards. *State v. Mattox*, No. 89,547, 2004 WL 719250, at *7-8 (Kan. App. 2004) (unpublished opinion), *rev'd in part on other grounds* 280 Kan. 473, 124 P.3d 6 (2005). But the Court of Appeals ruled about 2 months before the Supreme Court's *Patane* ruling, and the Court of Appeals had assumed that the gun and ballistics evidence would have been excluded along with Mattox's statements to the detectives. We do not share that assumption.

To the contrary, we conclude that the only evidence that would have been excluded had Mattox succeeded in the argument that

he had reinvoked his *Miranda* rights were his statements to the detectives. Even if those statements should have been excluded from evidence, Mattox has failed to persuade us that he would have been successful in his initial appeal. Indeed, we conclude beyond a reasonable doubt that the exclusion of those statements would have had no impact on the outcome of his trial given the other evidence against him. Mattox has thus failed to meet his burden to show prejudice under the *Strickland* test.

The judgment of the district court is therefore reversed.

LEBEN, J., assigned.