NOT DESIGNATED FOR PUBLICATION

No. 118,540

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ANTHONY L. TAYLOR,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed February 15, 2019. Affirmed.

*Roger L. Falk*, of Law Office of Roger L. Falk, P.A., of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., MALONE and LEBEN, JJ.

PER CURIAM: Convicted of two counts of aggravated indecent liberties with a child, Anthony Taylor filed a habeas corpus action seeking to set aside those convictions based on a claim that his trial and appellate attorneys hadn't provided him with adequate legal representation. The district court held an evidentiary hearing on Taylor's claim that his trial attorney had been ineffective by: (1) failing to investigate potential witnesses; (2) failing to call a DNA expert to testify at trial; (3) failing to attempt to introduce a claim that the victim had accused someone of rape before; and (4) failing to obtain a psychological evaluation of the victim. None of these claims is persuasive.

But Taylor had to show that some failing by his trial attorney prejudiced him at trial—that there's a reasonable probability that the trial's outcome would have been different had the attorney done these additional things. Taylor did not make that showing: (1) The new witnesses he called didn't substantially contradict the evidence supporting Taylor's conviction; (2) even now, Taylor hasn't said what additional evidence a defense DNA expert might have provided; (3) even now, Taylor hasn't proved either that the victim made a prior rape allegation against someone or, if she did, that it was false; and (4) Taylor hasn't shown that a psychological evaluation of the victim was appropriate or would have provided significant evidence.

Taylor also claimed that the attorney who represented him on direct appeal from his convictions provided inadequate representation by not arguing that the evidence was insufficient to convict him and for failing to properly argue the issue of judicial misconduct. But the evidence was enough to support these convictions. And our court independently reviewed the judicial-misconduct issue during trial, going beyond the specific arguments Taylor's attorney made. Because no error by Taylor's trial or appellate counsel affected the outcome of his case, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of the criminal case against Taylor were set out in our 2014 decision from his direct appeal. See *State v. Taylor*, No. 106,869, 2013 WL 2917813 (Kan. App. 2013) (unpublished opinion). We will summarize them here before discussing the claims being made in this appeal.

The underlying events took place in September 2009. A 13-year-old girl, M.O., alleged that Taylor, 43, a driver responsible for taking children to and from an after-school program, had had inappropriate sexual contact with her while he was taking her home. The State charged Taylor with one count of rape in violation of K.S.A. 21-3502(a)(2) and two

2

counts of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A).

At trial, M.O. testified that Taylor had taken her inside the auto-body shop that he owns, put her in an SUV that was at the shop, "lifted her shirt and bra, and licked her breast." She also told the jury that she and Taylor had "kissed and . . . he touched her breasts and vagina with his hands and penis" and that they had sex two times. As we said in our 2014 opinion in this case, though, "[h]er testimony about whether Taylor had put his penis inside her vagina varied." *Taylor*, 2013 WL 2917813, at *1. To corroborate M.O.'s allegations, one of the State's witnesses—a DNA expert—testified about a saliva stain that was consistent with a mixture of both M.O.'s and Taylor's DNA that was inside M.O.'s bra cup.

After a five-day trial, the jury acquitted Taylor of rape but found him guilty on both counts of aggravated indecent liberties. We affirmed Taylor's convictions in 2013. 2013 WL 2917813, at *1, 15.

Taylor then filed this habeas corpus claim, arguing that his trial attorney, Lee McMaster, had provided inadequate representation. The claims specific to this appeal are that McMaster was ineffective because: (1) he failed to investigate possible witnesses who could testify on Taylor's behalf; (2) he failed "to obtain expert witnesses"; (3) he failed "to attempt to pierce the rape shield law"; and (4) he failed "to obtain a medical [psychological] evaluation." Taylor also argued that his appellate counsel, Mike Brown, was ineffective because (1) he didn't "properly argue the issue of judicial misconduct" in Taylor's direct appeal and (2) he didn't "properly argue the issue of sufficiency of the evidence" to support the convictions.

The district court held an evidentiary hearing on Taylor's claims about his trial counsel. Although Taylor's motion had listed several potential witnesses that McMaster

3

didn't call at trial, Taylor presented only three of these witnesses at the evidentiary hearing on his habeas claim: Ruthie Walker; CJ Moore; and Lashekia Edwards. (One other witness, Lois Bobo, Taylor's mother, testified that she gave the names of potential witnesses to McMaster.) Walker testified that during the week when the crimes occurred, her grandson— who attended the after-school program for which Taylor was a driver— told her that Taylor had dropped him off last. Moore, also a driver for the after-school program, testified that on one night during the week in question, his bus broke down, so Taylor had to take more kids home than usual. Edwards, Taylor's fiancée, corroborated Moore's testimony that Taylor had to help Moore by taking additional kids home on one night at that time. Taylor also testified at his evidentiary hearing. He told the court that he provided McMaster a list of names to investigate as potential witnesses, including Walker, Moore, and Edwards, but that McMaster never interviewed or otherwise investigated them. Because McMaster died after Taylor's criminal trial and before the evidentiary hearing, he wasn't available able to testify about his representation of Taylor.

The district court denied Taylor's motion in a 15-page ruling. It concluded that McMaster had provided adequate counsel under constitutional standards. The court dismissed Taylor's claims about his appellate counsel without an evidentiary hearing, concluding that "the motion, files, and records of the case indicate that [Taylor] is not entitled to relief."

Taylor has appealed to this court.

4

*Taylor's Trial Counsel Didn't Fall Below an Objective Standard of Reasonableness, and He Was Not Prejudiced by his Attorney's Allegedly Deficient Performance.*

We begin our analysis with the standards that guide our review. When the district court has conducted an evidentiary hearing on a habeas claim under K.S.A. 2017 Supp. 60-1507, as it did here, we apply a two-part standard of review, asking (1) whether the district court's factual findings are supported by substantial evidence and (2) whether those findings are sufficient to support the district court's conclusions of law. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018); see *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007). Substantial evidence is evidence that a reasonable person would find sufficient to support a conclusion. *White*, 308 Kan. at 504. Once we have the facts in hand, we must independently determine whether habeas relief should have been granted based on the facts found by the district court that are supported by substantial evidence. 308 Kan. at 504; see *Bellamy*, 285 Kan. at 354-55.

Under K.S.A. 2017 Supp. 60-1507(b), a district court shall set aside a defendant's conviction if, among other reasons, "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." One such constitutional right is the Sixth Amendment's right to counsel, which includes the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 669, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Thus, ineffective assistance of counsel is a denial or infringement of constitutional rights that renders a judgment vulnerable to collateral attack (that is, an action separate from the original case or direct appeal). See K.S.A. 2017 Supp. 60-1507(b).

When a defendant seeks to set aside the result of a criminal trial on the ground that the defense attorney provided inadequate assistance, the defendant has the burden to show

"(1) that the attorney's work was below minimum standards and, thus, was constitutionally deficient; and (2) that the attorney's substandard work prejudiced the defense." *Mattox v. State*, 293 Kan. 723, Syl. ¶ 1, 267 P.3d 746 (2011). Since these tests were initially outlined in *Strickland*, courts call them the *Strickland* standards; the two parts of the test are commonly called the performance prong and the prejudice prong. *Mattox*, 293 Kan. at 725-26. To meet the prejudice prong, Taylor has to show that but for his attorney's deficient performance, there's a reasonable probability that the trial's outcome would have been different. See *State v. Cheatham*, 296 Kan. 417, Syl. ¶ 6, 292 P.3d 318 (2013). When reviewing claims of ineffective assistance of counsel, "judicial scrutiny of counsel's performance is highly deferential, and a strong presumption exists that counsel's conduct is reasonable." *Shumway v. State*, 48 Kan. App. 2d 490, 497, 293 P.3d 772 (2013).

A.       *Failure to Investigate and Call Potential Witnesses.*

Taylor claims McMaster was ineffective because he didn't investigate or call three individuals who he says could have bolstered his claim that he didn't commit the charged crimes. Taylor argued that the crimes couldn't have happened because the last person he dropped off on the days and during the times the crimes occurred was Walker's grandson. All three of the witnesses would have supported Taylor's claim that he wouldn't have been alone with M.O. at some point in time.

The problem with these witnesses, though, is that they don't prove Taylor's inability to have committed the crimes for which he was convicted. The most reliable evidence of when the crimes occurred came in the interviews of M.O. done by police and by an examining nurse right after M.O. first reported the abuse. Clay Germany, a detective, testified that M.O. told him she had been sexually assaulted starting about a week before she spoke with him. Germany said that M.O. reported sexual contact that began on Tuesday and continued through Friday of the week at issue, with intercourse on Friday: "She said it started with touching her and kissing on her, from there it gradually

6

got a little bit more aggressive and she culminated by saying that on Friday they had sexual intercourse . . . ." Similarly, the examining nurse, Rhonda Smith, said M.O. reported that the crimes began on Tuesday and that she and Taylor had sex on Friday.

So there were four nights during which the sexual activity may have taken place according to the statements M.O. made when she was first interviewed. None of the three new witnesses could shed light on that whole time period.

Walker was the grandmother of a boy who Taylor also took home from the Urban League program. Although Walker testified at Taylor's hearing that her grandson told her that he had been dropped off last, Walker wasn't able to specify which nights during the week that happened. Nor was she able to identify who the bus driver was on those nights.

The district court concluded that "Walker's testimony at the evidentiary hearing did not support the claims made in the pleadings." It considered how Walker didn't know which days her grandson arrived home late, didn't know who the bus driver was on those days, and didn't even know whether the nights he came home late were during the week in question. The district court concluded that "Walker's testimony would not have produced the desired effect of supporting [Taylor's] position, [so] there is no reasonable probability that the outcome of the trial would have been different."

Substantial evidence supports the district court's conclusion. Without more concrete testimony from Walker that identified the days her grandson arrived home late and who the bus driver was on those days, Taylor's claim that her testimony could have changed the outcome of his trial is conclusory and provides no basis for relief.

The other two new witnesses were C.J. Moore, who also drove a bus for the Urban League program, and Taylor's fiancée, Lashekia Edwards. Both Moore and Edwards told the court that on Thursday of that week, Moore's bus broke down and Taylor had to take

7

several additional children home. Since Taylor had to take more children home than usual on that night, Taylor says Moore's and Edwards' testimony would have served as evidence that Taylor couldn't have committed the crimes because he wasn't alone with M.O. on the night in question.

Once again, though, the testimony didn't establish Taylor's inability to commit the offenses on other nights. The district court said that "Moore's testimony could have provided an explanation for [Taylor's] whereabouts on one evening but Moore did not provide testimony about the other three evenings during the week in question and did not bear on what occurred after Moore's kids were picked up by [Taylor]." These findings are supported by substantial evidence.

Indeed, Moore didn't know exactly which night the bus broke down. Neither he nor Edwards provided any testimony explaining which additional children Taylor ended up taking to their homes along with those from Taylor's bus. And even Taylor testified at trial that he was alone with M.O. on at least two of the nights of the week in question, thus supporting the district court's conclusion that Moore's and Edwards' testimony "would not have produced the desired effect of supporting [Taylor's] position."

We can't say what McMaster did to investigate these witnesses; he wasn't able to tell us. But the testimony from Walker, Moore, and Edwards did not reliably show that Taylor lacked the opportunity to commit the crimes or directly negate any of M.O.'s testimony. Taylor did not show ineffective assistance of counsel in the failure to call these witnesses.

B.     *Failure to Call a DNA Expert as a Witness.*

Taylor contends that McMaster failed to adequately investigate and refute the State's DNA evidence by not retaining an expert on DNA evidence to testify at trial. He argues that

the State's DNA evidence was weak: the State's DNA evidence consisted of one hair consistent with the victim's that was found in Taylor's auto body shop and a "weakly positive" sample of saliva found in M.O.'s bra that was "consistent with a mixture of the DNA profile of Taylor and M.O."

But although Taylor's claim is that the trial result would have been different had McMaster hired a defense DNA expert, Taylor didn't present any DNA testimony at the evidentiary hearing on his habeas claim. That leaves only speculation to support his claim that the defense could have retained a DNA expert to challenge the State's evidence.

Taylor relies on *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222 (2002), to support his position. In *Mullins*, we upheld a defendant's habeas challenge when the trial attorney defending a child-sex-abuse charge didn't hire an expert witness who could testify about child-witness interview techniques. 30 Kan. App. 2d at 717-19. But in *Mullins*, at the habeas evidentiary hearing, the defendant presented three witnesses to support that claim:

- A criminal-defense attorney who had defended about 40 sexual-abuse cases testified that having an expert on witness-interview techniques is essential and that there was no valid defense strategy that could support failing to call one.
- A psychologist testified that the interviews of the victim in Mullins' case were flawed, making the victim's testimony unreliable.
- The attorney who had defended Mullins at trial testified that he hadn't interviewed key witnesses before trial, hadn't investigated the possibility of hiring an expert in child-interview techniques, and in hindsight now realized that with adequate resources he would have hired such an expert to help defend the case.

The record before us is much different than the record our court considered in *Mullins*. In that case, evidence supported the claim that specific testimony should have been obtained by the trial defense counsel *and* that this additional evidence would have

undercut key evidence supporting the criminal charge. In Taylor's case, no evidence supports his claim.

Meanwhile, the DNA expert who testified, Sarah Geering, a DNA analyst at the Sedgwick County crime lab, provided quite strong testimony. While she said her initial testing for saliva on M.O.'s bra was only "weakly positive," the saliva testing was just a preliminary step to see whether it was worth testing the bra for DNA. When Geering moved on to DNA testing from the bra, the DNA found there showed the presence of at least two people's DNA. And that DNA was consistent with both M.O.'s and Taylor's. Geering testified that the possibility that someone selected at random would have a DNA profile fitting within the mixture found was 1 in 4.85 billion for the Caucasian population, 1 in 3.48 billion for the black population, and 1 in 31.9 billion for the Hispanic population.

The State also presented two witnesses from a Minnesota state crime lab who did testing on the hair samples submitted by Wichita police. The Minnesota lab does testing of hair samples under contract with the Federal Bureau of Investigation. Steven Swenson, lead scientist in the lab's mitochondrial DNA section, testified that a hair that was found on the floor of Taylor's auto shop had the same mitochondrial DNA sequences as a pubic-hair sample obtained from M.O. Swenson testified that this mitochondrial DNA sequence would be found in less than one percent of the population.

McMaster cross-examined each of the witnesses the State called to talk about DNA evidence. But even now, Taylor hasn't presented any evidence that some other DNA expert would have disagreed with the findings of either Geering or Swenson. Taylor did not show that his trial counsel was ineffective for failing to call a DNA expert to testify at trial.

C.      *Failure to Seek a Pretrial Ruling on the Admissibility of Evidence about an Alleged Prior Rape Allegation by the Victim.*

Taylor next argues that McMaster was ineffective because he didn't file a pretrial motion that would have been necessary to fully cross-examine M.O. about whether she had accused someone else of rape when she was 10 years old. To understand this argument, we must first discuss some procedural law that applies when the victim in a sexual-assault case testifies.

The Kansas rape-shield statute, K.S.A. 21-3525, provides that evidence of the complaining witness' previous sexual conduct with any person is generally not admissible at trial. To get such evidence admitted, the defendant must file a motion before trial and demonstrate that the evidence will be relevant and otherwise admissible. K.S.A. 21-3525(b). The statute's purpose is to protect a victim of sexual abuse from unnecessary embarrassment and trauma resulting from irrelevant evidence of past sexual activity and to encourage victims to report and prosecute sexual crimes. *State v. Arrington*, 251 Kan. 747, 749-50, 840 P.2d 477 (1992).

With that background, let's consider the argument Taylor is making. When M.O. was testifying at Taylor's trial, McMaster asked her whether she remembered telling a detective that she had been raped when she was about 10 years old. The State objected, arguing that the information McMaster elicited through that question was prohibited under the Kansas rape-shield law "unless there's a filing of a motion ahead of time." McMaster responded that he wasn't asking M.O. "about her prior sexual conduct, [but] about what she said about her prior sexual conduct." He also said he didn't think that his proposed questions fell under K.S.A. 21-3525. The district court sustained the State's objection.

11

Our only knowledge of the underlying facts about this potential allegation that M.O. was raped when she was 10 years old comes from McMaster's question to M.O. We presume that he had a good-faith basis for asking the question, but there's no evidence in our record on the point. And there's no suggestion even in McMaster's question that M.O. had made a *false* rape allegation against someone else.

So while perhaps McMaster should have filed a pretrial motion to be able to inquire about this matter, it's also possible that there simply isn't anything of significance to the earlier potential rape allegation. Taylor has not shown that there was. Nor has he shown that McMaster failed to offer some evidence or cross-examination on the topic that would have impacted the trial's outcome.

D.      *Failure to Obtain a Psychological Evaluation.*

Taylor's final claim of substandard representation by McMaster is that McMaster should have sought a psychological evaluation of M.O. In sex-crime cases, the district court can order a psychological evaluation of a complaining witness if it determines, based on all the circumstances, that the defendant has shown compelling reasons to justify the evaluation. *State v. Berriozabal*, 291 Kan. 568, 581, 243 P.3d 352 (2010). This is a rigorous standard, and the court usually considers six nonexclusive factors related primarily to the existence of corroborating evidence and the witness' mental instability and trustworthiness:

> "(1) whether there was corroborating evidence of the complaining witness' version of the facts,
> "(2) whether the complaining witness demonstrates mental instability,
> "(3) whether the complaining witness demonstrates a lack of veracity,
> "(4) whether similar charges by the complaining witness against others are proven to be false,

12

"(5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and

"(6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth." 291 Kan. at 581.

Simply alleging mental instability, without more, isn't enough for a court to order a psychological evaluation—there must be demonstrable evidence of a mental condition that requires further investigation. *Berriozabal*, 291 Kan. at 581. Additionally, occasional inconsistent statements from the complaining witness don't compel the court to order a mental evaluation. 291 Kan. at 581.

Here, Taylor argues that all of these factors weighed in favor of ordering a psychological evaluation of M.O. We do not find that to be the case.

First, he claims that very little evidence corroborated M.O.'s allegations. It's true that only a few pieces of evidence helped to corroborate M.O.'s story. But as we found on direct appeal, although there were some inconsistencies in M.O.'s testimony, there was corroborating evidence:

"[A]s to the strength of the evidence, there were some inconsistencies in M.O.'s testimony about the precise days and exact locations where the crimes took place. On the other hand, the evidence consistently established they all occurred within the dates listed in the charging document and on the premises of Taylor's automotive shop. M.O.'s testimony also pretty much paralleled the statements she gave to the Sgt. Germany and the sexual assault nurse within a day or two of the crimes. Also, DNA testing established that pubic hair was found on the floor of Taylor's shop where M.O. said she was raped, and Taylor's DNA was found in M.O.'s bra." *Taylor*, 2013 WL 2917813, at *12.

As we noted there, and have discussed previously in this appeal, the corroborating evidence included DNA evidence about a pubic hair consistent with M.O.'s hair sample found in Taylor's shop and DNA consistent with Taylor's in saliva found in M.O.'s bra.

13

Second, Taylor claims that M.O. lacked mental stability because she had attention-deficit-hyperactivity disorder, oppositional-defiance disorder, and had been diagnosed as bipolar. But in *State v. McIntosh*, 274 Kan. 939, 944, 946, 58 P.3d 716 (2002), our Supreme Court held that the complaining witness' behavioral problems at school and her diagnosis of attention-deficit disorder were insufficient to support the sort of mental instability that would justify a psychological evaluation. Likewise, in *State v. Coggs*, No. 104,934, 2012 WL 5364658, at *3 (Kan. App. 2012) (unpublished opinion), we found that a bipolar diagnosis, on its own, didn't show a lack of mental stability. In this case, when the court held an evidentiary hearing on Taylor's claims, Taylor didn't produce any evidence showing that M.O.'s diagnoses affected her mental stability in any way that might have affected her testimony. Taylor has not demonstrated mental instability in M.O.

Third, Taylor argues that M.O. lacked veracity because "[h]er testimony varied each time she told it." This is also true—we noted on direct appeal that "there were some inconsistencies in M.O.'s testimony about the precise days and exact locations where the crimes took place." *Taylor*, 2013 WL 2917813, at *12. But the evidence wasn't entirely inconsistent: M.O.'s testimony stayed the same about where the crimes occurred and was essentially the same as the statements she gave the investigating detective and the sexual-assault nurse shortly after the crimes.

For the fourth *Berriozabal* factor—whether the complaining witness had previously made similar charges that have been proven to be false—Taylor points to the claim that M.O. had previously alleged that she had been raped when she was 10 years old. But even Taylor admits in his appellate brief that "there was no definite proof her prior similar allegations were found to be false [and] there was no action taken on her prior rape allegation." As we've noted, Taylor hasn't even cited to evidence in our record that M.O. even *made* such an allegation, let alone that it was a false allegation.

14

Fifth, Taylor argues that ordering a psychological evaluation of M.O. wouldn't have been a "fishing expedition" because of her diagnoses. But as already explained, just because M.O. had various mental conditions doesn't mean that those diagnoses affected her veracity. Taylor didn't provide any evidence explaining what, specifically, a psychological evaluation might have revealed. In other words, although he claims otherwise, Taylor fails to show that requesting the court to order a psychological evaluation would have been anything but a fishing expedition.

Sixth, Taylor claims that M.O. didn't understand what it meant to tell the truth. But he doesn't point to anything in the record of the trial or the habeas evidentiary hearing to support this claim. There were inconsistencies in her statements, but that's not "an unusual response when questioned about his or her understanding of what it means to tell the truth." See *Berriozabal*, 291 Kan. at 581. It's just the sort of inconsistency in testimony that happens in trials every day.

The decision to order a psychological evaluation of a complaining witness in a sex-crime case—here, M.O.—rests soundly in the district court's discretion. *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979). Although the district court never denied a request that M.O. receive a psychological evaluation because McMaster didn't ask that she receive one, Taylor fails to convince us that the district court would have granted the request in the first place. While the six factors listed in *Berriozabal* aren't exclusive, Taylor has not shown the compelling circumstances that would have justified McMaster requesting—or the court ordering—a psychological evaluation of M.O. See 291 Kan. at 582. Thus, we find that McMaster's performance didn't fall below an objective standard of reasonableness when he didn't ask the district court to order M.O. to undergo a psychological evaluation.

15

Even if Taylor would have shown that McMaster should have requested a psychological evaluation, we note that Taylor hasn't shown that he was prejudiced by that failure. Taylor has not shown how a psychological examination would have been helpful to his defense.

*The District Court Didn't Err by Summarily Dismissing Taylor's Claims Regarding his Appellate Counsel's Representation.*

Taylor also made claims that the attorney who represented him in his direct appeal did an inadequate job. The district court ruled against Taylor on these claims without an evidentiary hearing. The court has that option if the court's records show conclusively that Taylor was not entitled to relief on these claims. On appeal, we independently review that decision, with no required deference to the district court. See *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

The test for ineffective assistance of appellate counsel is the same two-part test for ineffective assistance of trial counsel—the performance must be deficient and prejudicial. See *Miller v. State*, 298 Kan. 921, 929-30, 318 P.3d 155 (2014). To show prejudice, Taylor must show that there is a reasonable probability that his appeal would have been successful but for any deficient performance by appellate counsel. See *Mattox*, 293 Kan. at 726.

He first claims his appellate counsel was ineffective for failing to properly argue the issue of judicial misconduct. For Taylor to succeed on this claim, he must show that if it weren't for his appellate counsel's failure to raise a judicial-misconduct claim, there is a reasonable probability that the appeal would have been successful. To figure that out, we must consider whether the district judge's actions rose to the level of judicial misconduct. To establish judicial misconduct, Taylor has to demonstrate that the district court's conduct substantially prejudiced his right to a fair trial. See *State v. Hayden*, 281 Kan. 112, 116, 130

16

P.3d 24 (2006); *State v. Miller*, 274 Kan. 113, Syl. ¶ 3, 49 P.3d 458 (2002). In determining whether Taylor has met his burden, we consider the "facts and circumstances surrounding the alleged misconduct." *Hayden*, 281 Kan. at 116.

This issue was raised in Taylor's direct appeal, but Taylor argues that his attorney incompetently argued the point. On direct appeal, Taylor's attorney simply argued that the district court improperly denied his motion for a mistrial after the trial judge inserted himself into the questioning of a police officer in a way that seemed to bolster the officer's credibility.

Taylor might have a point had our court on direct appeal treated the issue in the way Taylor's attorney presented it. As we noted in that appeal, Taylor argued that an abuse-of-discretion standard applied to review the denial of a mistrial motion. But our court treated the issue as a claim of judicial misconduct, and we gave unlimited independent review to the matter. *Taylor*, 2013 WL 2917813, at *2. By doing so, we thoroughly reviewed the record and independently determined whether judicial misconduct had occurred.

For that reason, we need not set out an extended discussion of the district court's actions during Taylor's criminal trial; all of that was set out in our decision in the direct appeal. And even though Taylor's attorney didn't argue the matter as he does now, we looked at it independently to see whether there was judicial misconduct. We recognized that the district court failed to follow "better practice," 2013 WL 2917813, at *3, but we concluded that Taylor had failed to show that he had been prejudiced by the district court's action. 2013 WL 2987813, at *5.

Given the two-part test for showing inadequate representation, Taylor can't meet the prejudice prong for this claim. Even if his attorney had argued for full review of a judicial-misconduct claim—not just review of the denial of a mistrial motion under normal

17

standards—we provided that full review. And we found that Taylor's claim failed on its merits; he had to show prejudice to succeed on this claim.

In the district court's order denying Taylor's K.S.A. 60-1507 motion, it explained that "[t]his argument is without merit, as the Court of Appeals found no actual prejudice existed. The court will not now revisit that ruling by the higher court; that ruling is the law of the case and is considered res judicata." We agree with the district court's conclusion.

"'The judgment of an appellate court on a defendant's direct appeal is res judicata as to all issues actually raised. Absent exceptional circumstances, those issues that could have been presented, but were not, are waived.'" *Calhoun v. State*, 56 Kan. App. 2d 185, 193, 426 P.3d 519 (2018) (quoting *State v. Barnes*, 37 Kan. App. 2d 136, Syl. ¶ 9, 149 P.3d 543 [2007]), *petition for rev. filed* August 24, 2018. Other than saying McMaster improperly argued this point and was thus ineffective, Taylor provides no exceptional circumstances as to why we should revisit the issue for a second time. He has not shown that our initial review was in any way inadequate.

Taylor also argues that his appellate counsel was ineffective for failing to argue on appeal that there wasn't enough evidence to convict him of the two counts of aggravated indecent liberties with a child. Once again, Taylor cannot meet the two-part test for showing inadequate representation. Even if there were a plausible argument to be made, we find sufficient evidence to support the jury's verdict. On a sufficiency-of-the-evidence issue, since a jury has already found the evidence sufficient, we must look at the evidence in the light most favorable to the State. See *State v. Robinson*, 306 Kan. 1012, 1022-23, 399 P.3d 194 (2017). Under that standard, M.O. told a fairly consistent story to both a police officer and an examining nurse about at least two separate sexual acts Taylor took against her that supported convictions—licking her breasts and touching her vagina. DNA testing found saliva with DNA consistent with Taylor's in M.O.'s bra and a pubic

hair with DNA consistent to M.O.'s in Taylor's auto shop. The evidence was sufficient to support the two convictions.

We affirm the district court's judgment.