NOT DESIGNATED FOR PUBLICATION

No. 122,555

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SHANNA FRIDAY,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed July 9, 2021. Affirmed.

*Brenda J. Clary*, of Law Office of Brenda J. Clary, of Lawrence, for appellant.

*Jon Simpson*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., BRUNS, J., and STEVE LEBEN, Court of Appeals Judge Retired, assigned.

LEBEN, J.: Shanna Friday appeals the district court's denial of her claim that the attorney who represented her in a murder trial provided ineffective assistance. An edited video of her interrogation by police was shown to the jury, and Friday argues that her attorney should have done more to keep that video from being shown at trial.

But her trial attorney made a strategic decision that showing it was the best way to defend her; by doing so, the jury heard her statements about what happened even though she didn't testify at trial. Attorneys have wide latitude to make strategic choices like that,

and the district court concluded the attorney made a reasonable strategic choice. We agree with that conclusion.

Friday had also argued at one point that her trial attorney should have made additional arguments that the statements she made during the interrogation were coerced, not voluntary. But the district court reviewed that and found her statements were voluntary, and Friday does not challenge that conclusion here. Since the statements were voluntary—and thus admissible—and her attorney made a reasonable strategic decision to use them at trial, we agree with the district court's conclusion that Friday's trial attorney provided constitutionally adequate representation. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Friday was convicted in a jury trial of reckless second-degree murder in the 2008 death of Jerry Deshazer. The district court sentenced her to 174 months in prison. She appealed, but the Kansas Supreme Court found no reversible trial errors and affirmed her conviction and sentence. *State v. Friday*, 297 Kan. 1023, 306 P.3d 265 (2013).

After a defendant has completed the direct appeal, he or she can bring further challenges in a habeas corpus proceeding. In a habeas action, the defendant can bring a claim that the defense attorney did an inadequate job at trial; that's the claim Friday made here.

Friday's habeas claim, as amended after an attorney was appointed to assist her, claimed her trial attorney's work had been inadequate in several respects. The district court found that none of them presented enough merit to warrant an evidentiary hearing. But Friday appealed that decision to our court, and we found that two claims should receive further review:

(1) that the attorney did not adequately argue that Friday's statements in a videotaped police interrogation were involuntary and therefore inadmissible; and

(2) that the attorney did not adequately argue even if Friday's statements were voluntarily made, the videotaped interrogation still should not be admitted because its content was objectionable for other reasons.

See *Friday v. State*, No. 115,234, 2016 WL 6920369, at *4-6 (Kan. App. 2016) (unpublished opinion).

The district court held an evidentiary hearing on those points. Two witnesses testified: Friday's trial attorney, Hatem Chahine, and Lance Flachsbarth, one of the two police detectives who interrogated Friday. The court also reviewed both the version of the interview played for the jury and a full version (without redactions).

One of the questions the district court had to resolve was whether Chahine's trial strategy—to allow presentation to the jury of Friday's videotaped statements—was reasonable. To consider that, we'll need to provide a bit of an overview of the charge against Friday and the other key evidence.

Friday was convicted of reckless second-degree murder. At the State's request, the trial court gave the jury an instruction that Friday could be convicted if she aided or abetted in the crime by assisting in its commission. See *Friday*, 297 Kan. at 1042. At that time, reckless second-degree murder was defined as the killing of a person committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-3402(b). The trial court also instructed the jury that reckless conduct is "done under circumstances that show a realization of the imminence of danger to the person of another[] and a conscious and unjustifiable disregard of that danger." So her conviction meant that the jury agreed that she had at least aided in reckless conduct that caused Deshazer's death and showed extreme indifference to the value of human life.

3

There were three people who had been with Deshazer the evening before he was found dead: Jerod Buffalohead, Jarvis Jones, and Friday. Buffalohead and Jones testified at Friday's trial. Each of the three told a different story about what had happened, but some basic facts were pretty clear. Someone had beaten Deshazer badly, and they'd left him badly injured. Chahine had to create at least reasonable doubt about Friday's guilt.

As an overview, Buffalohead would testify that Friday hit Deshazer in the face with a bottle—and that the bottle broke on his face. Jones would testify that Buffalohead, with encouragement from Friday, hit Deshazer five or six times while Deshazer was sitting in a chair. Friday told police that she had hit Deshazer in the face three times, but only after Buffalohead and Jones had beaten him. In Friday's direct appeal, our Supreme Court summarized their testimony and the initial police discovery of Deshazer's death:

> "On February 2, 2008, Deshazer was found dead in a bathtub in his mobile home in Lawrence. His body was covered in blood, and according to the coroner, his face was 'just bashed in.' The coroner determined the cause of death was blunt force injuries to the head, with additional contributing medical conditions.

> "The night before Deshazer's death, he got together at his home with Jerod Buffalohead, Jarvis Jones, and defendant Friday. Buffalohead and Jones arrived around 4:30 p.m., and Friday arrived around 5 p.m. All four drank alcohol together throughout the evening. Shortly after arriving, Buffalohead left and returned around 8:45 p.m.

> "At one point, Friday got into a verbal altercation with Deshazer. Their argument never became physical, and they eventually cooled down.

> "Shortly after Buffalohead returned to Deshazer's home, a physical altercation began. Buffalohead, Friday, and Jones each offered different versions of the episode that resulted in Deshazer's death.

4

"***Jerod Buffalohead***

"According to Buffalohead's testimony for the defense, he heard arguing when he returned to the mobile home around 8:45 p.m. Somebody told Buffalohead that he owed Deshazer money, so Buffalohead offered to pay Deshazer. But Deshazer said Buffalohead did not owe him anything. While Buffalohead was getting ice, 'a fight started' between Friday and Deshazer. Buffalohead testified:

"'I'm not real sure how the fight started, but I heard a slap, I heard a thud on the ground and—
. . . .
"' . . . [w]hen I heard all that, I turned around and Jerry [Deshazer is] on, is on, not on top of her—I don't know if they fell, I don't know—
. . . .
"'. . . I don't know if they tripped, but I pulled [Deshazer] off of [Friday].'

"After Buffalohead pulled Deshazer from Friday, he sat Deshazer in a chair and Friday momentarily left the room. When she returned, she again argued with Deshazer. According to Buffalohead, 'Jerry had a small bottle and I think that was plastic, but he threw it and it was, it landed in between 'em or he threw it on the ground.'

"After Deshazer threw the bottle, Friday slapped him and they started fist fighting. Buffalohead then separated them. Jones also intervened and began hitting Deshazer. Buffalohead cussed at Jones for hitting Deshazer. Friday then hit Deshazer in the face with a bottle. According to Buffalohead, he tried to grab the bottle, but it shattered on Deshazer's head.

"Jones continued to punch Deshazer's face until Buffalohead pulled him away. When Deshazer then stood up from his chair and started to go after Jones, Buffalohead threw a blanket over Deshazer to calm him down. Deshazer tripped over the blanket; then Buffalohead and Jones picked him up and put him back in his chair. After Buffalohead asked Friday if she had called for help, he left to go to his parents' house.

"*Shanna Friday*

"According to Friday's statements to police, at some point in the evening Buffalohead became angry at how Deshazer was treating Friday. So Buffalohead and Jones began beating Deshazer while he was sitting in a chair. They eventually threw a blanket over his head. Friday then punched Deshazer three times in the face, with Buffalohead and Jones moving out of her way. During the beating, Deshazer 'fought with his mouth' by 'talking shit.' According to Friday, Jones hit Deshazer with an ashtray, but she repeatedly denied anybody hit Deshazer with a bottle.

"After the physical altercation ended, Friday gave Deshazer water, some pills, and a blanket. She also tried to wipe him off. When she offered to call the police or an ambulance, he declined. Friday then lay on the couch and fell asleep. She awoke in the middle of the night and noticed Deshazer stumbling from one end of the home to the other. She also saw excrement. Friday apparently went back to sleep and left around 8 a.m. Before she left, Friday asked Deshazer if he was doing OK and if he wanted her to call the police or an ambulance. Deshazer responded from the bathroom that he was OK and did not want Friday to call anyone for help.

"*Jarvis Jones*

"According to Jones' testimony for the State, before Buffalohead returned to the home Deshazer said that Buffalohead owed him money. Friday then encouraged Deshazer to tell Buffalohead this when he came back. Buffalohead then walked in and asked, 'Tell me what?' So Friday told Buffalohead that Deshazer thought Buffalohead owed him money. Buffalohead then stood over Deshazer, and Deshazer 'let the matter go.'

"Jones had little recollection of the remaining events because he testified he was drunk and had blacked out from the alcohol. The next thing Jones remembered was people yelling. He saw Buffalohead hit Deshazer five or six times while Deshazer was seated in a chair. While Buffalohead was the only person Jones saw hit Deshazer, Friday was egging Buffalohead on by saying, 'That's what you get, that's what you get.' Buffalohead then threw a blanket or rug over Deshazer's head.

6

"Jones soon passed out again. When he awoke at 2:30 a.m., Jones saw Deshazer moaning in his chair with his head back. Deshazer's face and chest area were bloody. Jones then saw Deshazer 'slump' out of his chair and crawl to his bedroom. Jones left, intending to return to his own home, but he ended up drinking with Deshazer's neighbor. At dawn, Jones left the neighbor's home and returned to Deshazer's where he fell asleep in a back bedroom.

"***Finding the body and the police investigation***

"Later that morning Jim Vincent arrived at Deshazer's home. Vincent could not find Deshazer and left. He returned an hour later and asked Nancy Kelch to look for Deshazer. Kelch found him dead in his bathroom.

"When police arrived, they found broken glass—including the neck of a whiskey bottle covered in blood and a broken ashtray—in Deshazer's home. DNA on the broken ashtray and on the neck of the broken bottle matched Deshazer, while DNA on the bottle mouth matched Buffalohead. The police also found several items covered in blood, including a comforter and pillow. They further noticed a vast amount of blood, including significant amounts on Deshazer's recliner, on his floor, and in his bathroom.

"The next day police found bloody clothes in a trash can outside of Friday's residence. Friday admitted the clothes belonged to her, including a jacket, a pair of shoes, athletic pants, a T-shirt, a pair of socks, and women's underwear. DNA on the bloody jacket matched Deshazer. Friday agreed to accompany police to their station where she was read her *Miranda* rights and questioned." *Friday*, 297 Kan. at 1027-31.

The district court found that Friday's statements to the police had been made voluntarily, so a motion to exclude them as involuntary would not have been successful. In this appeal, Friday "does not directly challenge the . . . conclusion that her statement to detectives was voluntary and admissible." Rather, she argues that her "counsel's decision to abandon the [voluntariness] inquiry in favor of using the video" was unreasonable.

7

But the district court also found that Chahine's strategy was a reasonable one:

"Mr. Chahine testified . . . that it was a deliberate strategy to have the jury hear Ms. Friday's statement. Ms. Friday did not want to testify, but she felt she had made a compelling argument for innocence, or at least an argument that she was less culpable than others who were present on the night of the victim's death, and she wanted the jury to hear her version of the events. Mr. Chahine combined her statement to the detectives with the testimony of Mr. Buffalohead. Buffalohead admitted he hit the victim. Pictures of his hands and blood on his clothes corroborated his admission. His DNA was found on the broken bottle. Buffalohead attempted to give Friday a self-defense claim by testifying the victim hit her. . . . The strategy here was to shift the blame to Buffalohead and Chahine made some very strong points with Buffalohead's admissions. This then forced the State in its cross-examination to make Buffalohead out to be a liar and also point to him as the killer. This gave Chahine talking points in his closing to paint Buffalohead, not as a contributor to the death of the victim, but [as] the person solely responsible for his death.

"In the cross-examination of Jones, Chahine got Jones to admit he had blood on him; that Buffalohead cut the victim's head, not Friday; that Buffalohead hit the victim[;] and finally, Jones admitted to the jury that at the preliminary hearing, he testified Friday had nothing to do with killing the victim. This presentation of the events was strategically thought out by Mr. Chahine. Mr. Chahine may not have received an acquittal for his client, but his performance was effective[;] it was reasonable and strategic decisions were made to weave a consistent narrative for the jury by combining the testimony of Jones and Buffalohead with that [from the videotaped interrogation] of Ms. Friday. The fact that it was not a winning strategy does not mean counsel was ineffective."

Friday then appealed to our court.

ANALYSIS

Well-established rules apply when a defendant seeks to set aside a conviction based on the claim that the defense attorney provided representation so ineffective that it

8

was below constitutionally required standards. The defendant has the burden to show two things: (1) that the attorney's work was below minimum standards and thus constitutionally deficient; and (2) that the attorney's substandard work prejudiced the defendant. *Mattox v. State*, 293 Kan. 723, 725, 267 P.3d 746 (2011). The second part of that test ordinarily requires showing a reasonable probability that the result of the trial would have been different but for the attorney's substandard work. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Mattox*, 293 Kan. at 725-26. In sum, what is often called the *Strickland* test requires two showings— constitutionally deficient representation and prejudice to the defendant. If those showings are made, we set aside the conviction and send the case back for a new trial with proper representation for the defendant.

With the background facts and these rules in mind, we return to the specific claims that we determined in the earlier habeas appeal merited further review: (1) that the attorney did not adequately argue Friday's statements to police were involuntary and thus inadmissible; and (2) that the attorney did not adequately argue in the alternative that even if the statements had been voluntarily made, they still should not have been admitted for other reasons.

The first one can be quickly dismissed. In the habeas hearing, the district court found that Friday's statements were voluntary—the same finding the district court had made at trial after what Friday now argues was lackluster advocacy. But there wasn't lackluster advocacy at the habeas hearing, and Friday doesn't argue on appeal that the district court's voluntariness finding was in error. That precludes relief under *Strickland* because even if the advocacy on this point was so lackluster before trial to have been constitutionally deficient, there still would have been no prejudice to Friday: her statement was voluntary and thus admissible, anyway. Friday tries to avoid this result by arguing that "a vigorous but unsuccessful challenge" might have "prompt[ed] a beneficial plea offer" or otherwise altered the case. But that's too speculative to support a claim of

9

prejudice under *Strickland*. See *United States v. Rendon-Martinez*, 497 Fed. Appx. 848, 849 (10th Cir. 2012) (unpublished opinion); *Koch v. State*, No. 119,886, 2019 WL 3367319, at *3 (Kan. App. 2019), *rev. denied* 312 Kan. 892 (2020).

The second point is at the heart of this appeal. Chahine said that he decided that he could better present Friday's defense with her videotaped statements than without them. An attorney's strategic decisions are essentially unchallengeable if the attorney made an informed decision based on a thorough investigation of the facts and applicable law. The decision must be reasonable, and it falls below minimum constitutional standards only if no competent attorney would have adopted that strategy. *Wilson v. State*, 51 Kan. App. 2d 1, 14-15, 340 P.3d 1213 (2014).

On this claim, the district court conducted an evidentiary hearing, so we must accept its factual findings if they are supported by substantial evidence. But whether the attorney's work met or fell below the *Strickland* requirements is a legal issue that we review independently, with no required deference to the district court. *Khalil-Alsalaami v. State*, 313 Kan. ___, Syl. ¶ 5, 486 P.3d 1216 (2021); *Wilson*, 51 Kan. App. 2d at 14.

The district court accepted Chahine's testimony that he made a strategic choice to use the videotaped interview, so we must do so too. We must determine whether that choice was sufficiently reasonable that a competent attorney could have adopted it.

Earlier in the opinion, we quoted the district court's rationale for concluding that Chahine's strategic choice was a reasonable one. We agree with the essential points made there. Even though Friday didn't testify, the jury heard directly from her. In a case in which it was significant whether she had been indifferent to the value of Deshazer's life, the jury heard her say that she gave him water and a blanket after the fight had ended and that she had offered to call an ambulance. The jury heard a version of events in which her conduct was less harmful to Deshazer than other evidence suggested, and conflict

10

between the versions could have led to reasonable doubt of her guilt. Chahine used pieces of Friday's statements to police and the other evidence presented at trial to present a coherent defense.

Even so, Friday argues that Chahine's strategy ignored "the negative impact of the visual cues and unredacted material" in the videotape shown to the jury. She's right that some portions of the interview that could (and likely should) have been edited out were left in, and these portions included detectives making facial expressions indicating disbelief of Friday or direct statements of disbelief. But the argument Friday made in her habeas claim, now at issue in this appeal, is not that a few portions of the videotape that should have been redacted weren't. Rather, Friday's argument is that Chahine should have argued for the entire videotape to be excluded. We conclude that Chahine made a reasonable strategic decision to allow that videotape to be played at trial so that the jury could hear directly from his client.

Had the issue been that a few additional edits should have been made in the videotape played for the jury, that still would not have been a successful argument under *Strickland*. Even if we assume that the defense attorney's failure to get those other edits violated the *Strickland* performance standard, we still would not find *Strickland* prejudice. That requires a reasonable probability that the trial's outcome would have been different but for the attorney's substandard work. A reasonable probability in this context is one sufficient to undermine confidence in the proceeding's outcome. *Khalil-Alsalaami*, 313 Kan. ___, Syl. ¶ 23. Friday has not made that showing here.

Friday makes one more claim of error about the district court's ruling. At the very end of the district court's written opinion, the court's conclusion that *Strickland* prejudice is absent said: "This Court cannot say with any certainty that the outcome of the trial would have been different if the jury had heard a more thoroughly redacted video statement." Friday argues that the district court misstated the legal standard here. As

we've already discussed, the court must find "a reasonable probability" that the result would have been different, not "certainty."

But the district court had cited the proper standard earlier in its written opinion. So we think the later statement was just a shorthand way of saying that the court could not say with any level of certainty (including the reasonable-probability standard it had cited earlier in the opinion) that the outcome would have been different. Ultimately, it doesn't matter, though, since we have to review the *Strickland* conclusions independently, and we have found no prejudice on this point.

In sum, Friday does not challenge on appeal whether her statements to police were voluntary and admissible. Instead, her argument is that her attorney should have tried to keep them out as a matter of trial strategy. But the attorney testified that he concluded that her best defense was to have her videotaped statements played to the jury, and we agree with the district court that this was a reasonable decision. The district court dismissed Friday's habeas challenge, and we affirm the district court's judgment.